## MURRAY v. CHICAGO & N. W. RY. CO.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. June 14, 1894.)

1. COMMON LAW—APPLICATION TO MATTERS WITHIN FEDERAL JURISDICTION.

The adoption of the constitution of the United States and the consequent creation of the national government did not abrogate the common law previously existing; nor did the division provided for by the constitution, of governmental powers and duties between the national and state governments, deprive the people of the benefits of the common law; as to such matters as thereby were committed to the control of the national government, there were applicable the law of nations, the maritime law, the principles of equity, and the common law, according to the nature of the particular matter, the common law applicable to such matters being based on the common law of England, as modified by the surroundings of the colonists, and as developed by the growth of our institutions since the adoption of the constitution, and the changes in the business habits and methods of our people; and the binding force of the principles of this common law, as applied to such matters, is not derived from the action of the states, and is no more subject to abrogation or modification by state legislation than are the principles of the law of nations or of the law maritime.

2. FEDERAL COURTS—APPLICATION OF PRINCIPLES OF GENERAL JURISPRUDENCE —COMMON LAW.

The constitution of the United States and congress, acting in furtherance of its provisions, have conferred on the supreme court and the other courts inferior thereto the right and power to enforce the principles of the law of nations, of the law maritime, of the system of equity, and of the common law, in all cases coming within the jurisdiction of those courts,

applying, in each instance, the system which the nature of the case demands; and, as to all matters of national importance over which paramount legislative control is conferred upon congress, the courts of the United States have the right to declare what are the rules of general jurisprudence which control the given case, and to define the duties and obligations of the parties thereto.

3. CARRIERS—INTERSTATE COMMERCE—APPLICATION OF COMMON LAW.

In determining the obligations assumed by a common carrier engaged in interstate commerce, the court has the right to apply the rules of the common law, unless the same have been changed by competent legislative action; and, in an action for damages for charging unreasonable rates for transportation from one state to another, shipments made before the adoption of the interstate commerce act are governed by the common law, and those made after the adoption of that act by the common law as modified by the act.

4. COURTS—CONFLICTING STATE AND FEDERAL JURISDICTION—INTERSTATE COMMERCE.

The fact that the subject of interstate commerce is beyond state legislative control does not ipso facto prevent the courts of the state from exercising jurisdiction over cases arising from such commerce.

5. SAME—FOLLOWING STATE DECISIONS—LIMITATION OF ACTIONS.

The conclusion of a state court as to the time when a cause of action accrues in case of fraud or concealment, based, not on a construction of the state statute, but on the view taken of the rule of the common law, is not binding on the United States courts, when called on to construe the common law and apply its principles to cases arising between citizens of different states.

6. LIMITATION OF ACTIONS—FRAUDULENT CONCEALMENT.

Query, whether, in an action at law against a common carrier to recover the amount of excessive charges for freight made by defendant or of the damages caused thereby, the bar of the statute can be avoided by showing that defendant fraudulently concealed the fact that lesser rates were charged upon like shipments made by others, there being no statutory exception applicable to such case.

This was an action by Murray against the Chicago & Northwestern Railway Company to recover damages for alleged unreasonable rates charged for transportation of freight. Submitted on motion and demurrer to amended petition.

Rickel & Crocker, for plaintiff.

Hubbard & Dawley, for defendant.

SHIRAS, District Judge. In the amended petition filed in this cause it is averred that during the years 1875 to 1887, inclusive, the plaintiff was engaged at Belle Plaine, Iowa, in the business of buying and shipping to Chicago grain, cattle, and hogs, the same being shipped in car-load lots over the line of railway owned and operated by the defendant company; that, at the several times when the shipments were made, the defendant company had posted at its stations, including that at Belle Plaine, printed lists containing the tariff rates charged by the company for the transportation of freight over its line; that, when plaintiff shipped his stock, he applied to the defendant and its station agent at Belle Plaine for the lowest freight rates charged, and was answered by the defendant and its station agent that the posted rates were the lowest and only rates charged by the company, no rebates or concessions in any form being made

therefrom to any one; that thereupon the plaintiff shipped his stock, and paid the posted rates therefor; that in fact such representations were false, and were made to mislead the plaintiff; that in fact, as the defendant and its agents well knew, rebates and concessions were then being made to other parties who were competitors in business of the plaintiff, to the great injury of plaintiff; that the fact that these rebates were allowed to the competitors of plaintiff was kept concealed by the defendant, and was not discovered by the plaintiff until within 18 months previous to the commencement of this action; that upon shipments of grain made from points west of Belle Plaine to Chicago the defendant charged the shippers thereof some $15 per car less than it was then charging the plaintiff for shipping the same kind of grain from Belle Plaine to Chicago, thus discriminating against the plaintiff, and compelling him to pay an excessive and unreasonable rate. To recover the damages claimed to have been thus caused him, the plaintiff brought this action in the superior court of the city of Cedar Rapids, Iowa, whence it was removed to this court upon the application of the defendant company. On part of the defendant, a motion for a more specific statement has been filed, followed by a demurrer, and both have been submitted to the court.

The principal point made in the demurrer is that the petition on its face shows that the shipments made from Belle Plaine, Iowa, to Chicago, Ill., were in the nature of interstate commerce, the regulation of which is reserved to congress, exclusively, by section 8, art. 1, of the constitution of the United States, and that, at the dates of the several shipments in the petition described, there was no act of congress or other law regulating commerce between the several states. If I understand correctly the position of the defendant company, it is that, as this action was commenced in the state court, this court, upon removal, succeeds only to the jurisdiction which the state court might have exercised rightfully in case no removal had been had; that in the state court the action could not be maintained for two reasons: First, that as section 8, art. 1, of the constitution of the United States confers the right to regulate interstate commerce exclusively upon congress, thereby depriving the states of the power to legislate touching the same, it follows that state courts are deprived of all jurisdiction over cases growing out of interstate commerce; and, second, that there is no common law of the United States; that the common law of England has become the common law of the several states, in such sense that each state has its own common law; and that the common law of the state of Iowa cannot be applied to interstate commerce, in view of the provisions, already cited, of the constitution of the United States. Dealing with these propositions in the reverse order of their statement, is it true that the principles of the common law are not in force in the United States with respect to such subjects as are placed within the exclusive control of congress? It will not be questioned that, before the Revolution, the common law was in force, so far as applicable, in the several colonies then existing. Thus, in U. S. v. Reid, 12 How. 361–363, it is said:

"The colonists who established the English colonies in this country undoubtedly brought with them the common and statute laws of England, as they stood at the time of their emigration, so far as they were applicable to the situation and local circumstances of the colony."

When the constitution of the United States was adopted, it was based upon the general principles of the common law, and its correct interpretation requires that the several provisions thereof shall be read in the light of these general principles. The final disruption of all political ties between the colonies and the mother country did not terminate the existence of the common law in the colonies. It came originally into the several colonies, not by force of legislative enactments to that effect by the parliament of Great Britain, and the effect of which might be held to have terminated when the colonies became independent, but, as is said by Mr. Justice Story, speaking for the supreme court in Van Ness v. Pacard, 2 Pet. 137–144:

"Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation."

In Cooley, Const. Lim. 31, it is said:

"From the first the colonists in America claimed the benefit and protection of the common law. In some particulars, however, the common law, as then existing in England, was not suited to their condition and circumstances in the new country, and those particulars they omitted as it was put in practice by them. They also claimed the benefit of such statutes as, from time to time, had been enacted in modification of this body of rules; and, when the difficulties with the home government sprung up, it was a source of immense moral power to the colonists that they were able to show that the rights they claimed were conferred by the common law, and that the king and parliament were seeking to deprive them of the common birthright of Englishmen. * * * While colonization continued,—that is to say, until the war of the Revolution actually commenced,—these decisions were authority in the colonies, and the changes made in the common law up to the same period were operative in America also, if suited to the condition of things here. The opening of the war of the Revolution is the point of time at which the continuous stream of the common law became divided, and that portion which had been adopted in America on by itself, no longer subject to changes from across the ocean, but liable still to be gradually modified through changes in the modes of thought and of business among the people, as well as through statutory enactments. The colonies also had legislatures of their own, by which laws had been passed which were in force at the time of the separation, and which remained unaffected thereby. When, therefore, they emerged from the colonial condition into that of independence, the laws which governed them consisted—First, of the common law of England, so far as they had tacitly adopted it, as suited to their condition; second, of the statutes of England or of Great Britain, amendatory of the common law, which they had in like manner adopted; and, third, of the colonial statutes. The first and second constituted the American common law, and by this, in great part, are rights adjudged and wrongs redressed in the American states to this day."

Thus it appears that, when the constitution of the United States was adopted, the general rules of the common law, in so far as they were applicable to the conditions then existing in the colonies, and subject to the modifications necessary to adapt them to the uses and needs of the people, were recognized and were in force in the colonies, and the people thereof were entitled to demand the enforcement thereof through the judicial tribunals then existing.

The adoption of the constitution did not deprive the people of the several colonies of the protection and advantages of the common law. The constitution itself recognizes the fact of the continued existence of the common law, and indeed it is based upon the principles thereof, and its correct interpretation requires that its provisions shall be read and construed in the light thereof. By section 2, art. 3, of the constitution it is declared that:

"The judicial power shall extend to all cases in law and equity, arising under this constitution; the laws of the United States, and treaties made or which shall be made, under their authority; * * * to all cases of admiralty and maritime jurisdiction. * * ' *"

In this section we have a clear recognition of the existence of the several systems of law, equity, and admiralty. The section does not create these systems, but, recognizing their existence, it declares the extent of federal jurisdiction in regard thereto. The rules and principles which form the laws maritime are not created by the constitution, for, as is said by Chief Justice Marshall, in Insurance Co. v. Canter, 1 Pet. 511–546:

"A case in admiralty does not, in fact, arise under the constitution or laws of the United States. These cases are as old as navigation itself, and the law admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise."

In New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344–390, it is declared that:

"By the constitution, the entire admiralty power of the country is lodged in the federal judiciary, and congress intended, by the ninth section, to invest the district courts with this power, as courts of original jurisdiction."

The constitution does not create a system of maritime law, nor does it enact that the system, as prevailing in England or in Europe, shall become the law of the United States; but, recognizing the fact that the law maritime was then in force in the colonies, it confers the jurisdiction upon the federal courts. The same is true of the equitable jurisdiction. It is certainly not necessary to cite authorities in support of the proposition that the constitution of the United States neither created nor enacted a system of equitable jurisprudence and procedure, but, recognizing the existence of the system, it conferred upon the courts of the United States jurisdiction in equity, maintaining the pre-existing distinction between equitable and legal remedies. Is it not clear that the same is true in regard to the common law? At the time of the adoption of the constitution there was in existence in the colonies the system of the common law, of equity, and of admiralty. It was not the purpose of the constitution to abrogate any one of these systems. One of the main objects sought to be accomplished was to establish the extent of the legislative and judicial powers of the national government then being created. Owing to the fact that it was not proposed to destroy the state governments then existing, but, continuing these, to create a national government, to be paramount and supreme within its limited sphere, it became a necessity that the extent of the powers of each government should be defined; and, in a general sense, it may be

said that the plan adopted was to confer upon the national government the power of control over subjects affecting the country or people at large, reserving to the states control over all that are local, or which do not require a uniform system or law for their proper regulation. Can it be denied that, at the time of the adoption of the constitution, the people of the several states possessed the rights, and were subject to the duties and obligations, recognized and enforced by the principles and modes of procedure forming the separate systems of law, equity, and admiralty? Is there any ground for holding that it was the purpose of the constitution to recognize the continuing existence of the systems of equity and admiralty, but to deny the existence of the common law, or to refuse its recognition? Such a construction of its provisions is clearly inadmissible. The principles and modes of procedure of the three systems of law, equity, and admiralty, in force previous to the adoption of the constitution, remained in force after its adoption, save as to such modification as were created by the provisions of the constitution. That this is the true view of the question appears, not only from the references found in the constitution, and the amendments thereto, to the common law, as a recognized and existing system, but in the judiciary act of 1789 the several branches of the law, such as the law of nations, the common law, the admiralty and maritime law, and equity are fully recognized as then existing, and the jurisdiction arising under the same is divided between the courts created by that act. That the principles of the common law have always been recognized and enforced in proper cases by the courts of the United States is a proposition so plain that a citation of the cases is not necessary for its support; yet, to show the course of judicial action in this particular, a few of the numerous cases to be found in the decisions of the supreme court will be quoted from.

In Cox v. U. S., 6 Pet. 172–204, wherein suit was brought in the United States court in Louisiana upon the bond of a navy agent, it was held that the bond must be deemed to be a contract performable at the city of Washington, "and the liability of the parties must be governed by the rules of the common law." To the same effect is the ruling in Duncan v. U. S., 7 Pet. 435. In Swift v. Tyson, 16 Pet. 1–18,—a case involving the law of negotiable paper,—the supreme court held that the provisions of the thirty-fourth section of the judiciary act of 1789 did not require the courts of the United States to follow the ruling of the state courts upon the principles established in the general commercial law, it being said by Mr. Justice Story, speaking for the court, that:

"We have not now the slightest difficulty in holding that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principle and doctrines of commercial jurisprudence."

To the same effect is the ruling in Oates v. Bank, 100 U. S. 239, and Railroad Co. v. National Bank, 102 U. S. 14. In the latter case it is said:

"The decisions of the New York court, which we are asked to follow in determining the right of parties under a contract there made, are not in exposition of any law local to that state, but as to their rights under the general commercial law existing throughout the Union, except where it may have been modified or changed by some local statute. It is a law not peculiar to one state, or dependent upon local authority, but one arising out of the usages of the commercial world."

In Fenn v. Holmes, 21 How. 481–484, it is said:

"In every instance in which this court has expounded the phrases 'proceedings at common law' and 'proceedings in equity,' with reference to the exercise of the judicial powers of the courts of the United States, they will be found to have interpreted the former as signifying the application of the definitions and principles and rules of the common law to the rights and obligations essentially legal, and the latter as meaning the administration with reference to equitable, as contradistinguished from legal, rights of the equity law, as defined and enforced by the court of chancery in England."

In Railroad Co. v. Lockwood, 17 Wall. 357, the question of the power of a common carrier to exempt himself by contract from the liability placed upon him by the common law is discussed at length, and it was held that the court was bound to decide the question upon the ground of public policy, and according to the principles of general commercial law.

The case of Kohl v. U. S., 91 U. S. 367, 374–376, presented the question whether the United States could exercise the right of eminent domain for the purpose of condemning land in the city of Cincinnati, to be used as a site for a public post office. The right was maintained, it being said that:

"When the power to establish post offices and to create courts within the states was conferred upon the federal government, included in it was authority to obtain sites for such offices and for courthouses, and to obtain them by such means as were known and appropriate. The right of eminent domain was one of those means, well known when the constitution was adopted, and employed to obtain lands for public uses. Its existence, therefore, in the grantee of that power, ought not to be questioned. * * * The right of eminent domain always was a right at common law. It was not a right in equity, nor was it even the creature of a statute. The time of its exercise may have been prescribed by statute, but the right itself was superior to any statute. * * * It is difficult, then, to see why a proceeding to take land by virtue of the government's eminent domain, and determining the compensation to be made for it. is not, within the meaning of the statute, a suit at common law, when initiated in a court. , It is an attempt to enforce a legal right."

In Moore v. U. S., 91 U. S. 270, the question was, by what law is the court of claims to be governed in respect to the admission of evidence in the hearings had before it? and the supreme court held that:

"In our opinion it must be governed by law; and we know of no system of law by which it should be governed other than the common law. That is the system from which our judicial ideas and legal definitions are derived. The language of the constitution and of many acts of congress could not be understood without reference to the common law. The great majority of contracts and transactions which come before the court of claims for adjudication are permeated, and are to be adjudged, by the principles of the common law."

In Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667–681, 4 Sup. Ct. 185, it is said:

"The Atchison, Topeka & Santa Fe Company, as the lessee of the Pueblo & Arkansas Valley Railroad, has the statutory right to establish its own stations, and to regulate the time and manner in which it will carry persons and property, and the price to be paid therefor. As to all these matters it is undoubtedly subject to the power of legislative regulation, but, in the absence of regulation, it owes only such duties to the public, or to individuals, associations, or corporations, as the common law, or some custom having the force of law, has established for the government of those in its condition."

In Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, was presented the question whether the engineer and fireman of a locomotive engine are fellow servants, so that the fireman could not recover from the railway company damages for injuries caused by the negligence of the engineer, there being no statutory enactment to that effect in the state of Ohio, wherein the accident happened. Under the decisions of the supreme court of Ohio, liability on part of the railway company existed; but the supreme court of the United States refused to follow these rulings, holding that:

"The question is essentially one of general law. It does not depend upon any statute. It does not spring from local usage or custom. There is in it no rule of property, but it rests upon those considerations of right and justice which have been gathered into the great body of the rules and principles known as the 'common law.' There is no question as to the power of the states to legislate and change the rules of the common law in this respect, as in others; but, in the absence of such legislation, the question is one determinable only by the general principles of that law."

Citations of this character from the decisions of the supreme court might be continued almost without limit. From them it appears, beyond question, that the constitution, the judiciary act of 1789, and all subsequent statutes upon the same subject are based upon the general principles of the common law, and that, to a large extent, the legislative and judicial action of the government would be without support and without meaning if they cannot be interpreted in the light of the common law. When the constitution was adopted, it was not the design of the framers thereof to create any new systems of general law, nor to supplant those already in existence. At that time there were in existence and in force in the colonies or states, and among the people thereof, the law of nations, the law admiralty and maritime, the common law, including commercial law, and the system of equity. Upon these foundations the constitution was erected. The problem sought to be solved was not whether the constitution should create or enact a law of nations, of admiralty, of equity, or the like, but rather how should the executive, legislative, and judicial powers and duties based upon these systems, and necessary for the proper development and enforcement thereof, be apportioned between the national and state governments. The principles, duties, and obligations inhering in these systems of law were already in force. The constitution neither created nor adopted them, but, recognizing the fact that they were in fact in existence, and were the possessions of the people, it proceeded to apportion the exercise thereof between the national and state governments. The general line of division, as already said, is based upon the principle of national control over subjects affecting the country and the people as a whole, and wherein

uniformity of rule and control is desirable, if not indispensable, and of state control over subjects of local interests. The result was that upon the national government was conferred, as to some subjects, paramount and exclusive control; as to others, paramount, but not exclusive, control, unless congress by legislation excluded state action; as to others, control concurrent with the states. The division thus made is as to the subjects of legislative and judicial jurisdiction, and not a division of systems of law. The constitution does not place under national control the law of nations and of admiralty, and under state control common law and equity, but it divides the subjects of governmental control, and each subject carries with it the law or system appropriate thereto. The subject-matter of dealing with other nations is conferred exclusively upon the national government, and of necessity all questions arising under the law of nations and the right to seek changes in this law by conventions with other governments are committed to the national government. The right to regulate foreign commerce is conferred exclusively upon congress, and of necessity that confers upon the national legislature and judiciary the duty of enforcing the law maritime. The right to regulate interstate commerce is conferred exclusively upon congress, and, when it legislates, the resulting statute will be interpreted with reference to the general principles of the common law. In the absence of congressional regulation of interstate commerce, the courts called upon to decide cases arising out of interstate commerce must apply the principles of the common law. So, also, when called upon to decide cases arising out of intrastate commerce, when there is no state statute or law applicable thereto, the courts must apply the common law. The apportionment of control over foreign, inter and intra state commerce, made by the constitution, did not affect the applicability of the common law thereto. It divided the control over the general subject of commerce, and apportioned to the national government exclusive legislative control over foreign and interstate commerce; and this apportionment carried with it the right to confer upon the national judiciary jurisdiction over cases involving foreign and interstate commerce, and, in the exercise of this jurisdiction, the courts are bound by the general principles of the common law, save where the same have been changed by legislative enactment.

To me it seems clear, beyond question, that neither in the constitution, nor in the statutes enacted by congress, nor in the judgments of the supreme court of the United States can there be found any substantial support for the proposition that, since the adoption of the constitution, the principles of the common law have been wholly abrogated touching such matters as are by that instrument placed within the exclusive control of the national government. But it is not to be denied that support to the proposition is to be found in part of the reasoning employed by Mr. Justice Matthews in announcing the opinion of the supreme court in Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564. This case came before the supreme court upon a writ of error bringing into review a judg-

ment of the supreme court of Alabama affirming a judgment of the city court of Mobile in habeas corpus proceedings, and which presented the question whether a statute of the state of Alabama, providing for the examination and licensing engineers engaged in operating locomotive engines in that state, was void, as applied to engineers running interstate trains, on the ground that it was an attempt to regulate interstate commerce. The case did not in fact involve any question in regard to the common law. The judgment of the court was that the statute was passed to secure the safety of the public in person and property, and any effect it had upon interstate commerce was incidental and remote; and the validity of the statute was sustained. In the course of the opinion it is pointed out that the laws of the states provide for remedies in cases of nonfeasance or misfeasance on part of common carriers, and that it had never been held that such laws were void, as being unconstitutional regulations by the state of interstate commerce. Following these propositions, we find it said:

"But for the provisions on the subject found in the local law of each state, there would be no legal obligation on the part of the carrier, whether ex contractu or ex delicto, to those who employ him; or, if the local law is held not to apply where the carrier is engaged in foreign or interstate commerce, then, in the absence of laws passed by congress or presumed to be adopted by it, there can be no rule of decision based upon rights and duties supposed to grow out of the relation of such carriers to the public or to individuals. In other words, if the law of the particular state does not govern that relation, and prescribe the rights and duties, which it implies, then there is and can be no law that does until congress expressly supplies it, or is held by implication to have supplied it, in cases within its jurisdiction over foreign and interstate commerce. The failure of congress to legislate can be construed only as an intention not to disturb what already exists, and is the mode by which it adopts, for cases within the scope of its power, the rule of the state law, which, until displaced, covers the subject. There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England, as adopted by the several states, each for itself, applied as its local law, and subject to such alterations as may be provided by its own statutes. * * * There is, however, one clear exception to the statement that there is no national common law. The interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history. The code of constitutional and statutory construction, which, therefore, is gradually formed by the judgments of this court, in the application of the constitution and the laws and treaties made in pursuance thereof, has for its basis so much of the common law as may be implied in the subject and constitutes a common law, resting on national authority."

The meaning to be given to this last sentence quoted from the opinion of Mr. Justice Matthews is not at all clear. If it be true that the supreme court, in construing the provisions of the constitution, and the laws and treaties made in pursuance thereof, has the right to adopt, as the basis of its construction, so much of the common law as may be implied in the subject, which proposition seems to be affirmed, then is it not true that the principles of the common law, so far as applicable to the subject-matter, are recognized as in force touching matters of national control? It is evident that it was present to the mind of the learned justice whose opinion we are considering that it would not do to hold

that the failure of congress to legislate touching the duties and obligations of common carriers engaged in interstate commerce left the public without any law for its protection, and therefore the suggestion is made that:

"The failure of congress to legislate can be construed only as an intention not to disturb what already exists, and is the mode by which it adopts, for cases within the scope of its power, the rule of the state law."

The rules prevailing in the different states may be variant or antagonistic. A delivery of goods may be made to a common carrier in California, for transportation to New York. Do the legal relations, duties, and obligations existing between the shippers and carrier vary and change as the shipment passes state boundaries, so as to accord with the local law of each state through which the carrier may choose to take them? Upon such a theory, what becomes of the principle that the exclusive control of foreign and interstate commerce was committed to congress in order to secure a uniform rule touching the same? I would amend the statement of Mr. Justice Matthews so that it should read:

"The failure of congress to legislate can be construed only as an intention not to disturb what already exists; and as, at the time of the adoption of the constitution, common carriers, under the principles of the common law, were subject to certain duties and obligations, the failure on the part of congress to legislate thereon evinces the legislative intent to leave the rules and principles of the common law in full force, as controlling and defining the relations, duties, and obligations of common carriers engaged in interstate commerce."

It will be further noticed that it is suggested in the opinion that it might be implied that congress has supplied a law or rule governing foreign and interstate commerce. Is there not as good ground to be found in the provisions of the constitution, and the statutes based thereon, for implying the recognition of the principles of the common law, as there is for implying the recognition of the law of nations, or the maritime law as applied to foreign commerce? Suppose a merchant or manufacturer residing in the United States makes a shipment of goods by land into the dominion of Canada, and another shipment of goods to England by sea, in both instances the goods being delivered to common carriers for transportation and delivery; would not the duty and obligations resting upon the steamship line to which the goods destined for England were delivered be measured by the law maritime? What express provision of the constitution or of the statutes of the United States declares that shipowners engaged in foreign commerce are subject to the law maritime? Has congress ever adopted a code of laws declaring what the rules and principles are that are applicable to foreign commerce carried on over the high seas or the navigable waters of the country? It has adopted specific provisions modifying the general principles of the law, but it has always recognized the existence of the general system. Can it be contended that, in the absence of legislation by congress expressly adopting the law maritime, foreign shipments upon the ocean are without legal protection; that, from the acceptance of the goods for trans-

portation and delivery, no implied contract is created; that the respective rights and duties of the parties are such, and such only, as may be created by express contract between the parties? Even if an express contract is entered into, by what rules and principles are its provisions to be construed? That the law maritime has been in force, and is now in force, in the United States, cannot be questioned; and yet it was not created or expressly enacted in the constitution or any act of congress. That system of law was in existence when the constitution was adopted, and its existence is recognized in the constitution, and provision is made for enforcing the same by conferring admiralty jurisdiction upon the courts of the United States. From this the inference, and the only inference, is that it was not the intent of the constitution to abrogate the then existing maritime law, but, recognizing its existence, to provide for its enforcement in all matters to which it is applicable, including foreign commerce. There is no doubt, therefore, that, as to that part of foreign commerce which is carried on through the agency of common carriers upon navigable waters, there is a system of law applicable thereto, and courts having jurisdiction to enforce the principles of the system. How is it, in regard to that part of foreign commerce carried on with neighboring countries, where the transportation is by land, as in the case supposed of a shipment of goods to Canada? It is said that the common carrier engaged in foreign commerce cannot be held subject to the principles of the common law, because congress has not expressly adopted the common law, and therefore it cannot be applied to shipments made to foreign countries. Is not the existence of the common law as fully recognized in the constitution, and the laws of congress based thereon, as is the existence of the law maritime? Do not the constitution and the judiciary act confer upon the courts of the United States full common-law jurisdiction? Are not the courts of the United States, therefore, authorized to enforce the principles of the law maritime and the common law in all cases to which they are applicable, and which are within the jurisdiction of the federal courts? Suppose a shipment of goods is made from San Francisco, through New York, to England. The carrier receives the goods to be sent by land to New York, and thence by ship to England. No special contract is made. This shipment is a matter of foreign commerce. When placed on shipboard at New York for transportation to England, is there any doubt that the law maritime is applicable thereto, and that, if litigation should arise regarding the ocean transportation, the courts of the United States would apply the principles of the law maritime thereto? If litigation with the common carrier should arise touching the land transportation, would not the courts of the United States have the right to apply the principles of the common law thereto? Upon what fair principle of construction can it be held that the constitution so far recognizes the law maritime that it must be held to be in force, but that the recognition of the common law is not sufficient to keep it in force in matters of national concern?

In Swift v. Railroad Co., 58 Fed. 858,—a case decided by the United States circuit court for the northern district of Illinois,—it is held that the law of the state of Illinois could not be applied to contracts for shipments of property into other states; that interstate commerce cannot be controlled by the local law of the state, either statutory or common; that, previous to the enactment of the interstate commerce act by congress, there was no act of congress regulating interstate commerce; that the United States had never adopted the common law; that, previous to the adoption of the interstate commerce act in 1887, there was therefore no law controlling the relations of carriers and shippers in regard to interstate commerce. If it be true that the principles of the common law are not in force in this country in regard to such matters as are placed under national control, then it is difficult to escape the conclusions reached by Judge Grosscup in the case just cited; but I cannot concur in the proposition that the principles of the common law have no existence in this country, as applicable to national affairs, or that these principles have only a local existence, due to their adoption by the several states. It is certainly a novel proposition that up to the date of the enactment of the interstate commerce act, in 1887, all the foreign and interstate commerce of the country was without the pale of law, and that there were no legal rules or principles which governed or controlled the relations between the shippers or carriers engaged in that business; and yet such seems to be the conclusion in Swift v. Railroad Co. In Railway Co. v. Osborne, 3 C. C. A. 347, 52 Fed. 912,—a case involving the construction of the interstate commerce act,—Mr. Justice Brewer, speaking for the court, held:

"It was the first effort of the general government to regulate the great transportation business of the country. That business, though of a quasi public nature, and therefore subject to a governmental regulation, has, as a matter of fact, been carried on by private capital through corporations. The fact that it was a public business always prevented the owners of capital invested in it from charging, like owners of other property, any price they saw fit for its use. A reasonable compensation was all they could exact, and he who felt aggrieved by a charge could always invoke the aid of the courts to protect himself against it."

Mr. Justice Brewer is here speaking of the condition of affairs before the enactment of the interstate commerce act, and he expressly declares that, prior to that act, common carriers engaged in interstate commerce were bound to charge only a reasonable compensation, or, in other words, they were subject to the principles of the common law.

It is further argued that it has been repeatedly decided that the inaction of congress, up to 1887, in passing any law regarding interstate commerce, shows that the intent was to leave such commerce free from all restraint, and therefore common carriers assumed no common-law liability in undertaking shipments of goods from one state to another. The decisions of the supreme court in the numerous cases involving the validity of state laws affecting foreign and interstate commerce have always held that the inaction of congress could not be construed to mean that the states were

at liberty to legislate in regard to these subjects in the absence of congressional legislation, but that such inaction evidenced that it was the intent of congress to leave commerce, foreign and interstate, free from all legislative restrictions. It has never been held, however, that the freedom of commerce meant that those engaged in carrying it on were not under legal restraints and obligations growing out of the relations of carriers and shippers. If the theory now contended for by the defendant company be correct, then from the foundation of the government up to April 4, 1887, when the interstate commerce act took effect, it was open to all the common carriers engaged in foreign or interstate commerce to act as they pleased in regard to accepting or refusing freights, in regard to the prices they might charge, in regard to the care they should exercise, and the speed with which they should transport and deliver the property placed in their charge. What more disastrous restraint upon the true freedom of foreign and interstate commerce could be devised than the adoption of the doctrine that the inaction of congress left the carriers engaged therein entirely free to accept and transport the property of one man or corporation, and to refuse to accept the like property of another, or to transport the products of one locality, and to refuse to transport those of another; to charge an onerous toll upon the property of one, and carry that of his neighbor for nothing? Can it be possible that the transcontinental railways and other federal corporations engaged in foreign and interstate commerce, in the absence of congressional legislation, were not under any legal restraints, and that the citizen, in his dealings with them, was without legal remedy or protection? In the absence of congressional legislation, what law could be applied to them, with regard to matters under the exclusive control of the national government, except the principles of the common law or the law maritime? I cannot yield assent to the broad proposition that, as to those subjects over which congress is given exclusive legislative control, there is no law in existence if congress has not expressly legislated in regard thereto. The true doctrine, in my judgment, is that the constitution of the United States, when it was adopted, gave full recognition to the existing systems of the law of nations, of admiralty and maritime, of the common law, and equity. It apportioned to the national government, then created, control over certain subjects, exclusive as to some, concurrent as to others. This apportionment of control over certain subjects necessitated the exercise of both legislative and judicial powers, and provision was made for the former in the creation of congress, and for the latter in the creation of the supreme court, and by conferring authority on congress to create other courts. The courts thus created were vested with jurisdiction in admiralty and at common law and in equity. If there is no common-law jurisdiction to be exercised, and no common-law principles to be enforced, why create courts for that purpose? But it is said in Swift v. Railroad Co., and the same thought is found in other cases, that "the courts of the United States have had many occasions to enforce the common law, but in every instance it has been

as the municipal law of the state by which the subject-matter was affected." This may be generally, but it is not universally, true. In Mississippi Mills v. Cohn, 150 U. S. 202, 14 Sup. Ct. 75, we find a case which was originally brought in a court of the state of Louisiana, in which state the civil, and not the common, law is in force. The suit was removed into the United States circuit court, and was by that court dismissed for want of jurisdiction, upon the ground that, being a suit in equity, it could not be maintained, because the remedy at law was sufficient. The supreme court reversed the ruling, holding that even if, under the law of the state of Louisiana,—that is, the civil law,—the remedy at law was sufficient, yet that fact would not defeat the jurisdiction in equity of the federal court, for the reason "that the inquiry, rather, is whether, by the principles of common law and equity, as distinguished and defined in this and the mother country at the time of the adoption of the constitution of the United States, the relief here sought was one obtainable in a court of law, or one which only a court of equity was fully competent to give." In this ruling the supreme court was certainly not enforcing the municipal law of the state of Louisiana. If courts of the United States can only recognize and enforce the principles of the common law when the same form part of the municipal law of the state, how comes it that the supreme court directed the circuit court in Louisiana to apply the principles of the common law and of equity, as they existed when the constitution was adopted, to the decision of the question of jurisdiction arising in that case? Suppose a state should enact that all questions of title to realty should be triable only in a court of equity, and in accordance with the principles of equity; would that enactment confer upon the courts of the United States the same jurisdiction, and thus permit a question of strict legal title to be tried in equity in the courts of the United States, if, according to the principles of the common law in force when the constitution was adopted, an action in ejectment would afford an ample remedy? Clearly, the federal court could in such case entertain only the common-law action, and in so doing it would be acting under and enforcing the principles of the common law, not the municipal law of the state, for it would be disregarding that, but the common law brought by our ancestors from the mother country.

Perhaps the most forcible illustration of the fact that the government of the United States does recognize and enforce the principles of the common law with regard to subjects wholly within national control, and not as part of the municipal law of any state, is found in connection with the organization and proceedings of the court of claims. This court is not a court in and for the district of Columbia, nor is it a court of any district or circuit. It has jurisdiction over cases arising in any of the states or territories. It has jurisdiction to hear and determine cases against the United States. Of all the courts in the Union, it is the one dealing with matters of national concern, arising under the constitution and laws of the United States, and not under the local law of the several states. The form of procedure is statutory, supplemented

by rules of its own adoption. As to this court thus organized, and clothed with a jurisdiction wholly national in its character, the express ruling of the supreme court is to the effect that the general law controlling its action is the common law. To repeat a quotation already made from the opinion of the supreme court in Moore v. U. S., 91 U. S. 270, in regard to the court of claims:

"In our opinion, it must be governed by law; and we know of no system of law by which it should be governed other than the common law. * * * The great majority of contracts and transactions which come before the court of claims for adjudication are permeated and are to be adjudged by the principles of the common law."

To the same effect is the ruling in U. S. v. Clark, 96 U. S. 37, and there are no decisions to the contrary. There is no act of congress which adopts the common law as the rule of action for the court of claims. The reasons which declare the common law to be the system governing its action apply equally to the other courts of the United States. By the provisions of the act of congress of March 3, 1887, concurrent jurisdiction with the court of claims is conferred upon the district and circuit courts of the United States. Many of the claims against the United States arise out of implied contracts; that is, the facts are such that, according to the principles of the common law, an obligation to pay for the use of property is implied, in the absence of an express contract. Thus, in U. S. v. Palmer, 128 U. S. 262, 9 Sup. Ct. 104, the judgment of the court of claims awarding to Palmer the sum of $2,256.75 as a reasonable compensation for the use, by the government, of certain patented military equipments, was sustained by the supreme court, it being said that "we think an implied contract for compensation fairly arose under the license to use, and the actual use, little or much, that ensued thereon." In this case there was no express agreement for compensation nor for the amount thereof. Applying the principles of the common law to the facts, the court of claims held that the law would imply a contract to pay a reasonable compensation, and the supreme court affirmed the judgment. Had Palmer brought the suit in a circuit court of the United States instead of in the court of claims, is it possible he would have been defeated on the ground that the local law of the state did not apply, and that the common law could not be invoked in a circuit court of the United States, and therefore there was no law applicable to the situation in the absence of an express contract? The right of recovery in such cases is not dependent upon the court in which the action may be brought, but upon the question of the principles of law—that is, the system of law—which are applicable to the situation, and which define the rights and obligations of the parties. Under the principles of the common law, as the same existed at the time of the separation between the colonies and Great Britain, common carriers of goods assumed certain duties and obligations to their patrons. The adoption of the constitution of the United States certainly did not change the relation existing between the carrier and the public, nor in any way affect the obligations assumed by the carrier. The constitution conferred

legislative control over foreign and interstate commerce upon congress, reserving to the several states legislative control over intrastate commerce. This division of legislative control did not, however, abrogate the common-law principle then in force. Thus, in Boyce v. Anderson, 2 Pet. 150, the question presented was whether the strict rule of the common law in regard to liability for goods lost could be applied in the case of slaves; and it was held that it would not be applied, as slaves were human beings having a volition of their own; but it was held that "the ancient rule that the carrier is liable only for ordinary neglect still applies to them." In determining the rights of the parties in this case, the supreme court, speaking by Marshall, C. J., relied upon the common law for its guidance. In Bank of Kentucky v. Adams Exp. Co., 93 U. S. 174, the question arose as to the liability of the express company for certain packages of money sent from New Orleans, La., to Louisville, Ky., and which were destroyed by fire while in transit, the bills of lading containing stipulations in respect to the liability of the company. It will be noticed that the shipment was from one state to another, and therefore was of the nature of interstate commerce. In the course of the opinion it is said:

"We have already remarked that the defendants were common carriers. * * * Having taken up the occupation, its fixed legal character could not be thrown off by any declaration or stipulation that they should not be considered such carriers. The duty of a common carrier is to transport and deliver safely. He is made, by law, an insurer against all failure to perform this duty, except such failure as may be caused by the public enemy, or by what is denominated the 'act of God.' * * * The exception or restriction to the common-law liability introduced into the bills of lading given by the defendants. * * *"

Thus we have the express declaration that a common carrier engaged in interstate commerce is subject to the common-law liability pertaining to his occupation. Many other cases of like import are to be found in the Supreme Court Reports, in which it is assumed that the principles of the common law are applicable to common carriers engaged in foreign or interstate commerce; and I can see no good reason for holding that the duties and obligations imposed upon a common carrier by the common law are not operative when he undertakes the transportation of property from state to state. It is said in argument that the obligations imposed upon common carriers are largely based upon considerations of public policy; that each state determines for itself what its public policy demands; and that the courts of the United States can recognize and enforce only the public policy of the state. There is a public policy of the nation as well as that of the several states. As to all such matters as are reserved to the states, and are therefore without the plane of national control, it may well be that it is for each state to determine what public policy dictates with regard thereto. The rule of the common law is that no one can lawfully do that which is injurious to the public, or which conflicts with the prevailing sentiment or interest of the community. In determining whether a given act or course of conduct is injurious to the public interests, regard must be had to the circumstances.

That which the public interests may demand in one locality may not be suited to the interests of another locality.    There are many matters of a local nature which it is for each state to regulate and control for itself, either by legislation, or by judicial declarations of the results derivable from the application of common-law principles to the existing surroundings.    On the other hand, there are many matters which affect the entire country, which are therefore of national importance, and which must be dealt with accordingly.    In deciding legal questions arising out of the latter class of cases, courts are not confined to the inquiry whether the particular state in which the court may be sitting, has an established public policy touching the subject-matter, but they will apply the recognized principles of general jurisprudence, to wit, the principles of the common law, or of the law of nations, or of the law maritime, as the nature of the particular case may demand.    Thus, in Oscanyan v. Arms Co., 103 U. S. 261, the supreme court held that a contract entered into between a consul general of the Ottoman government residing at New York, and a company engaged in supplying arms, whereby the former was to be paid a commission upon all contracts secured through his aid was void, even though it might be valid in Turkey, it being said:

"But admitting this to be otherwise, and that the Turkish government was willing that its officers should take commissions on contracts obtained for it by their influence, that is no reason why the courts of the United States should enforce them.    Contracts permissible by other countries are not enforceable in our country if they contravene our laws, our morality, or our policy."

The variety of cases in which this doctrine is applied may be seen by reference to Marshall v. Railroad Co., 16 How. 314;  Tool Co. v. Norris, 2 Wall. 45;  Trist v. Child, 21 Wall. 441;  Meguire v. Corwine, 101 U. S. 108;  Texas v. White, 7 Wall. 700;  Hanauer v. Doane, 12 Wall. 342;  Thomas v. City of Richmond, Id. 349;  Woodstock Iron Co. v. Richmond & D. Extension Co., 129 U. S. 643, 9 Sup. Ct. 402.    In these cases, and others of similar import, the supreme court does not base the rulings upon the local law of any state, for in the majority of the cases the question arose in connection with matters outside the plane of state control.    Thus, in Trist v. Child, supra, a bill in equity was filed to enforce an agreement for services rendered in getting through congress a bill for payment to Trist of a remuneration for his services to the United States in negotiating the treaty of Guadalupe Hidalgo with Mexico.    Mr. Justice Swayne, speaking for the court, declared that:

"It is a rule of the common law, of universal application, that where a contract, express or implied, is tainted with either of the vices last named as to the consideration on the thing done, no alleged right founded upon it can be enforced in a court of justice."

Applying this rule of the common law to the facts of the case, the agreement sought to be enforced was held void.

The conclusion I reach upon this subject is that at the time of the separation of the colonies from the mother country, and at the time of the adoption of the constitution, there was in existence a com-

mon law, derived from the common law of England, and modified to
suit the surroundings of the people; that the adoption of the consti-
tution and consequent creation of the national government did not
abrogate this common law; that the division of governmental pow-
ers and duties between the national and state governments provid-
ed for in the constitution did not deprive the people who formed
the constitution of the benefits of the common law; that, as to such
matters as were by the constitution committed to the control of
the national government, there were applicable thereto the law of
nations, the maritime law, the principles of equity, and the common
law, according to the nature of the particular matter; that, to
secure the enforcement of these several systems when applicable,
the constitution and congress, acting in furtherance of its provisions,
have created the supreme court of the United States and the other
courts inferior thereto, and have conferred upon these courts the
right and power to enforce the principles of the law of nations, of
the law maritime, of the system of equity, and of the common law
in all cases coming within the jurisdiction of the federal courts,
applying, in each instance, the system which the nature of the case
demands; that, as to all matters of national importance over which
paramount legislative control is conferred upon congress, the courts
of the United States (the supreme court being the final arbiter)
have the right to declare what are the rules deducible from the prin-
ciples of general jurisprudence which control the given case, and
to define the duties and obligations of the parties thereto; that
the common law now applicable to matters committed to the control
of the national government is based upon the common law of Eng-
land, as modified by the surroundings of the colonists, and as de-
veloped by the growth of our institutions since the adoption of the
constitution, and the changes in the business habits and methods
of our people; that the binding force of the principles of this common
law, as applied to matters affecting the entire people, and placed
under the control of the national government, is not derived from
the action of the states, and is no more subject to abrogation or
modification by state legislation than are the principles of the law
of nations or of the law maritime. The transactions out of which
the present controversy arises pertain to interstate commerce. The
defendant company, when engaged in transporting the grain and
cattle of plaintiff from Iowa to Chicago, Ill., was acting as a common
carrier of property, and assumed all the duties and obligations per-
taining to that occupation. In determining the obligations assumed
by a common carrier engaged in interstate commerce, the court
has the right to apply the rules of the common law, unless the same
have been changed by competent legislative action, and therefore,
in the present case, all shipments made before the adoption of the
interstate commerce act are governed by the common law, and those
made since the adoption of that act by the common law as modified
by that act.

A further point is made in support of the demurrer, to the effect
that this court succeeds only to the jurisdiction of the state court
in which the action was originally brought, and that state courts

have no jurisdiction over cases arising out of interstate commerce, the argument being that, as the state cannot legislate touching interstate commerce, the state courts are without power to determine cases of the like character. This position is not well taken. The limitations upon the legislative power of the nation and of the several states do not necessarily apply to the judicial branches of the national and state governments. The legislature of a state cannot abrogate or modify any of the provisions of the federal constitution nor of the acts of congress touching matters within congressional control, but the courts of the state, in the absence of a prohibitory provision in the federal constitution or acts of congress, have full jurisdiction over cases arising under the constitution and laws of the United States. The courts of the states are constantly called upon to hear and decide cases arising under the federal constitution and laws, just as the courts of the United States are called upon to hear and decide cases arising under the law of the state, when the adverse parties are citizens of different states. The duty of the courts is to explain, apply, and enforce the existing law in the particular cases brought before them. If the law applicable to a given case is of federal origin, the legislature of a state cannot abrogate or change it, but the courts of the state may apply and enforce it; and hence the fact that a given subject, like interstate commerce, is beyond state legislative control, does not, ipso facto, prevent the courts of the state from exercising jurisdiction over cases which grow out of this commerce. Had this action remained in the state court in which it was originally brought, that court would have had jurisdiction to hear and determine the issues between the parties, because congress has not enacted that jurisdiction over cases of this character is confined exclusively to the courts of the United States, and therefore the jurisdiction of the state court was full and complete.

The demurrer also presents the question of the statute of limitations, it being claimed that, under the provisions of the statute of Iowa, all right of action is barred in five years from the date of the shipments on which it is claimed unjust charges were made. The petition contains five counts. In each the real ground of complaint is that the defendant company charged plaintiff unjust, excessive, and unreasonable rates upon the shipments made by him. It is averred that the defendant company was performing the same service for other parties at less rates, thus discriminating against the plaintiff; but, as I construe the counts of the petition, the averments of discrimination are made as evidence in support of the charge that the rates exacted of the plaintiff were excessive and unreasonable. The action was commenced on the 25th day of August, 1892, and on part of the defendant it is claimed that the statute bars the suit as to all shipments made prior to August 25, 1887. In the petition it is charged that the unreasonable rates were exacted during the years from 1875 to 1891, both inclusive, it being further averred that, from time to time, plaintiff, when about to make shipments, made inquiry of the station

agent of the defendant at Belle Plaine for the lowest rates, and was assured by such agent that the published rates were the lowest given; that no secret rebates or commissions were allowed to other parties; that the rate demanded of plaintiff was the same, and as favorable, as that demanded of all others making like shipments; that these representations were in fact false; that the defendant company was giving other shippers rebates and concessions, keeping the fact secret, which amounted to $25 per car; that plaintiff, relying upon the assurances made him, paid the rates demanded, which were in fact excessive, and greater than those paid by other shippers, and that plaintiff did not discover the fact that rebates had been allowed others until within a year last past. There can be no doubt that whatever cause of action exists in favor of the plaintiff, by reason of the charge of excessive or unreasonable rates, accrued to him as each shipment was made. If the facts are as is alleged in the petition, then, upon the payment by plaintiff of the excessive charges upon each shipment, a right of action accrued to the plaintiff for the recovery of the damages thus caused him, which was then as full and complete as it is at the present time. The ordinary rule is that the statute begins to run when the right of action is completed. Does the case fall within any exception to this rule? The provision of the statute applicable to the case is the general one, to wit, "and all other actions not otherwise provided for in this respect, within five years." Section 2529, Code Iowa. By section 2530, Id., it is declared that "in actions for relief on the ground of fraud or mistake, and in actions for trespass to property, the cause of action shall not be deemed to have accrued until the fraud, mistake or trespass complained of shall have been discovered by the party aggrieved;" but it is settled that this statutory exception is not applicable to cases of the character of that now under consideration. District Tp. v. French, 40 Iowa, 601; Carrier v. Railway Co., 79 Iowa, 80, 44 N. W. 203. It is, however, claimed by plaintiff that, under the principles of the common law, it will not be held that the cause of action has accrued until actual discovery of the fraud or concealment has been had. In District Tp. v. French, supra, the supreme court of Iowa held that where a treasurer of the district, by false and fraudulent entries upon his books, concealed the fact of a misappropriation of a sum of money coming into his hands, the statute did not begin to run until discovery of the fraud thus practiced. In Carrier v. Railway Co., supra, the supreme court of Iowa held the common-law exception applicable in an action of a similar character to that now before the court, upon the authority of District Tp. v. French; stating, however, that, "if the question was before us for the first time, we might hesitate to declare the rule announced in District Tp. v. French." The conclusion reached in Carrier v. Railway Co. is followed and affirmed in Cook v. Railway Co., 81 Iowa, 551, 46 N. W. 1080. These decisions are based, not upon a construction of the provisions of the Iowa statute, but upon the view therein taken of the rule of

the common law; and the conclusion reached is not, therefore, binding upon the courts of the United States when they are called upon to construe the common law, and apply its principles to cases arising between citizens of different states. Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914.

As already stated, this action is not based upon the fraudulent representations made. It is not an action in the nature of trespass on the case or of deceit, according to the common-law form of procedure, and based upon the false assertions or representations, and for the recovery of the damages caused thereby, but rather in the nature of an action for money had and received to recover back the alleged excessive part or portion of the rates charged and paid. A right of recovery would be established by proof showing that the plaintiff had been compelled to pay an unreasonable rate, even though it might appear that the plaintiff knew at the time that the rate was unreasonable, for a shipper may be so circumstanced that he is compelled to ship, and cannot exercise an option to ship or not; and, if he cannot ship except by paying the unreasonable charge, he may do so, and may then sue to recover back the excess wrongly exacted from him. Robertson v. Frank Bros. Co., 132 U. S. 17, 23, 10 Sup. Ct. 5. Where the action is not founded upon the alleged fraud or concealment, but is in the nature of an action for money had and received, the decided cases are not in accord upon the question whether concealment of the fact of an excessive charge will prevent the running of the statute. Where a party seeks relief on the ground of fraud, either in the nature of a proceeding in equity for the purpose of canceling the transaction, and restoring the parties to their original position and rights, or by means of an action at law for the damages, there is certainly strong ground for holding that the same principle should be applied to either form of action, and that the statute should not be held to apply except from the discovery of the fraud which constitutes the basis of the action; and this is the conclusion of the supreme court in Bailey v. Glover, 21 Wall. 342. The form of the action is not, therefore, the determinative consideration, but the question is whether, in an action at law to recover the amount of the excessive charges made by defendant, or of the damages caused thereby, the bar of the statute can be avoided by showing that the defendant fraudulently concealed the fact that lesser rates were charged upon like shipments of property made by other parties. Technically, the action is not based upon the fraudulent concealment of the fact that rebates were allowed other parties, but upon the fact that unreasonable rates were exacted of the plaintiff. No case decisive of this question in this court has been cited by counsel. Other cases of like character are pending in the court, and the expense of trying the same upon the facts will be great. In view of this fact I deem it most desirable that the question of the applicability of the statute of limitations should be finally settled before further expense is made in these cases, and, as the question presented by the demurrer can be readily presented to the court of appeals at small cost, and with little

delay, I shall sustain the demurrer on the question of the statute of limitations, to the end that the parties may secure a ruling from the court of appeals upon the questions involved before incurring the expense necessarily attending a jury trial.