## HANAUER *v.* DOANE.

1. Action will not lie for the price of goods sold in aid of the Rebellion, or with knowledge that they were purchased for the Confederate States government.

2. A promissory note, the consideration of which is wholly or in part the price of such goods, is void, and an action cannot be sustained thereon by a holder who received it knowing for what it was given.

3. Due-bills given for the price of such goods and passed into the hands of a person knowing the fact, will not be a good consideration for a note.

4. It is contrary to public policy to give the aid of the courts to a vendor who knew that his goods were purchased, or to a lender who knew that his money was borrowed, for the purpose of being employed in the commission of a criminal act, injurious to society or to any of its members.

ERROR to the Circuit Court for the Eastern District of Arkansas.

This was an action by Doane against L. & J. Hanauer, to recover the amount of two promissory notes, dated in February, 1867. These notes were originally given by the said L. &. J. Hanauer, under the firm of L. Hanauer & Co., to one Hunter, in settlement of an account between them and the firm of Hunter & Oakes, which had mostly accrued in the years 1860, 1861, and 1862. A portion of this account was for items of private and family use; the residue was partly for supplies and commissary stores for the Confederate army sold by Hunter & Oakes to L. Hanauer, a recognized supply contractor of the Confederate government; and partly for due-bills issued by Hanauer, as such contractor, to

other persons in payment of army stores and supplies, and taken up by Hunter & Oakes at Hanauer's request, under a promise to redeem the same.

The question in the case was whether the notes sued on, having been given for the consideration mentioned, were valid.

The defendants asked the court to charge thus:

"1. If the jury find that Hunter & Oakes sold to L. Hanauer a quantity of goods and chattels knowing that the said Hanauer was purchasing them as supplies for the rebel army to carry on the war against the United States, and that the price of the same form a part of the consideration of the notes sued on, then they will find for the defendants.

"2. If they find that L. Hanauer, acting as a purchasing agent for the Confederate States, in rebellion, gave out notes or due-bills for supplies furnished the rebel army with the knowledge of the persons from whom such purchases were made, of the use to which the said supplies were to be put, and that, during the time when the said due-bills were in the course of being issued, the said Hanauer made an agreement with said Hunter & Oakes that the latter should take up said due-bills and charge them to said Hanauer, the said Hunter & Oakes knowing the purpose for which the same were issued, and that the price of said due-bills so taken up forms any part of the consideration of the notes sued on, then they will find for the defendants."

The court refused so to charge, and charged as follows:

"If these due-bills were taken up by Hunter & Oakes, after they were issued to the parties to whom they were payable, and upon the promise of Hanauer that he would redeem them, then, as between Hanauer and Hunter & Oakes, the surrender by Hunter & Oakes to Hanauer of such due-bills so taken up by them, would constitute a good and sufficient consideration for the amount thereof. And this is the law, although you may find that the parties to whom the due-bills were payable knew at the time of making the sale of supplies or property to L. Hanauer that he intended to turn the same over to the rebel army, and that Hunter & Oakes had notice of these facts. To affect the validity of the notes sued on, as to that part of the

consideration made up of these due-bills, you must be satisfied' that Hunter & Oakes were interested in furnishing the supplies to the rebel army for which the due-bills were given, or that what they did in the premises was done for the purpose or with the view of aiding in furnishing supplies to the rebel army, otherwise giving aid and comfort to the rebellion.

"Then, as to the other item, comprising a part of the consideration of the notes sued, the account of Hunter & Oakes against Hanauer as supply contractor for supplies sold to Hanauer. It is asserted that Hunter & Oakes knew that the articles mentioned in this account were purchased by Hanauer to be turned over as supplies to the rebel army, and the defendant maintains that this knowledge of the use intended to be made by Hanauer of these goods made the sale illegal, and that the amount of these sales having been included in the notes sued on, they are illegal and void. This is not the law. Bare knowledge, on the part of Hunter & Oakes, that Hanauer intended or expected to turn the goods and property purchased from them over to the rebel army as supplies for said army would not make such sale of goods and property illegal and void. To make the sale of goods from Hunter & Oakes to Hanauer illegal and void, it must appear that Hunter & Oakes had some concern in furnishing the supplies to the rebel army, or that it was part of the contract between Hunter & Oakes and Hanauer that such goods should go to the support of the rebel army, or that the design of Hunter & Oakes, in making such sale, was to aid in furnishing supplies to the rebel army, or otherwise give aid and comfort to the rebellion. But if the goods were sold by Hunter & Oakes in the common and ordinary course of trade, and the only inducement to the sale of the goods on the part of Hunter & Oakes was the price agreed to be paid by Hanauer for the same, then the sale was a legal and valid sale, although Hunter & Oakes know that Hanauer intended or expected to turn such goods over to the rebel army."

Judgment having gone for the plaintiff, the defendant, Hanauer, brought the case here on exceptions to the charge; the question in this court being, of course, the same one as in the court below, to wit, whether the notes sued on, having been given for the consideration mentioned, were valid.

*Messrs. Watkins and Rose, for the plaintiffs in error; Mr. A. H. Garland, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

We have already decided, in the case of *Texas* v. *White*,* that a contract made in aid of the late rebellion, or in furtherance and support thereof, is void. The same doctrine has been laid down in most of the circuits, and in many of the State courts, and must be regarded as the settled law of the land. Any contract, tinctured with the vice of giving aid and support to the rebellion, can receive no countenance or sanction from the courts of the country. Are the notes in suit of this kind? A portion of their consideration was stores and supplies furnished to the army contractor of the Confederate government, and another portion was due-bills issued for the same consideration, and received by Hunter & Oakes with full notice of their character. If either of these portions of the consideration on which the notes were given was illegal, the notes are void *in toto*. Such is the elementary rule, for which it is unnecessary to cite authorities.

On the trial of the cause below, the judge, in charging the jury, instructed them that if Hunter & Oakes took up Hanauer's due-bills for value, at his request and on the faith of his promise to redeem them, made after he had given them out for supplies, these due-bills would constitute a good consideration for the notes. We do not think that this was a correct statement of the law. If Hanauer had borrowed money from Hunter & Oakes to redeem the due-bills himself, the transaction would have been different, and the loan of money would have been legal, although Hunter & Oakes had known for what purpose Hanauer wanted the money. They would have been one degree farther removed from the unlawful transaction. But, instead of this, they became the holders of the due-bills, knowing for what purpose and on what consideration they had been issued; and

---

* 7 Wallace, 700.

hence their title was no better than that of the original holders. To vitiate this title it was not necessary, as stated by the judge, that Hunter & Oakes should have been interested in furnishing the supplies for which the due-bills were given; nor that what they did should have been done with the view of aiding the rebel cause. If the due-bills were invalid in the hands of the original holders, they were invalid in the hands of Hunter & Oakes. Whether they were invalid depends on the solution of the question whether the sales of supplies to Hanauer, for the use of the Confederate army, was, or was not, an illegal transaction. We think it was. But on this subject it is proper to examine the views of the judge at the trial.

With regard to that portion of the consideration of the notes which consisted of supplies sold by Hunter & Oakes to Hanauer for the Confederate army, the judge instructed the jury that bare knowledge on the part of Hunter & Oakes that Hanauer intended, or expected, to turn the goods over to the rebel army, would not make the sale illegal and void, but that, to make it so, it must appear that Hunter & Oakes had some concern in furnishing the supplies to the rebel army, or intended to aid therein. In this instruction we think the judge erred. With whatever impunity a man may lend money or sell goods to another who he knows intends to devote them to a use that is only *malum prohibitum*, or of inferior criminality, he cannot do it, without turpitude, when he knows, or has every reason to believe, that such money or goods are to be used for the perpetration of a heinous crime, and that they were procured for that purpose. In the words of Chief Justice Eyre, in *Lightfoot* v. *Tenant*,* " the man who sells arsenic to one who, he knows, intends to poison his wife with it, will not be allowed to maintain an action on his contract. The consideration of the contract, in itself good, is there tainted with turpitude which destroys the whole merit of it. . . . No man ought to furnish another with the means of transgressing the law, knowing that he

---

* 1 Bosanquet & Puller, 551, 556.

intended to make that use of them." On this declaration Judge Story remarks: "The wholesome morality and enlarged policy of this passage make it almost irresistible to the judgment; and, indeed, the reasoning seems positively unanswerable."* Can a man furnish another with the means of committing murder, or any abominable crime, knowing that the purchaser procures them, and intends to use them, for that purpose, and then pretend that he is not a participator in the guilt? Can he wrap himself up in his own selfishness and heartless indifference and say, " What business is that of mine? Am I the keeper of another man's conscience?" No one can hesitate to say that such a man voluntarily aids in the perpetration of the offence, and, morally speaking, is almost, if not quite, as guilty as the principal offender.

No crime is greater than treason. He who, being bound by his allegiance to a government, sells goods to the agent of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of treason or a misprision thereof. He voluntarily aids the treason. He cannot be permitted to stand on the nice metaphysical distinction that, although he knows that the purchaser buys the goods for the purpose of aiding the rebellion, he does not sell them for that purpose. The consequences of his acts are too serious and enormous to admit of such a plea. He must be taken to intend the consequences of his own voluntary act.

The decision of Chief Justice Eyre, in the case above referred to, has been followed in several other English cases. It was followed by Lord Ellenborough in *Langton* v. *Hughes,*† where a druggist sold drugs of a noxious and unwholesome nature to a brewer, knowing that they were to be used in his brewery, contrary to law, and it was held that he could not recover the price. It was also followed by Chief Justice Abbott, in *Cannan* v. *Bryce,*‡ where it was held that money

---

* Story's Conflict of Laws, § 253.          † 1 Maule & Selwyn, 593.
‡ 3 Barnewall & Alderson, 179.

lent to a man to enable him to settle his losses on an illegal stockjobbing transaction, could not be recovered back. Said the Chief Justice: "If it be unlawful in one man to pay, how can it be lawful for another to furnish him with the means of payment? . . . The means were furnished with a full knowledge of the object to which they were to be applied, and for the express purpose of accomplishing that object." In that case the lender had no interest whatever in the unlawful transaction, and was only connected with it, as Hunter & Oakes were in this case, by knowing the object for which the money was borrowed. These cases were followed by the Court of Errors of New York, in the case of *De Groot* v. *Van Duzer*.* Chancellor Walworth, in that case, observes that, "those cases in which an independent contract has been held void from a mere knowledge of the fact of the illegal end in view, proceed upon the ground that the party having such knowledge intended to aid the illegal object at the time he made the contract."

There are cases to the contrary; but they are either cases where the unlawful act contemplated to be done was merely *malum prohibitum*, or of inferior criminality; or cases in which the unlawful act was already committed, and the loan was an independent contract, made, not to enable the borrower to commit the act, but to pay obligations which he had already incurred in committing it. Of the latter class was the case of *Armstrong* v. *Toler;*† of the former, those of *Hodgson* v. *Temple*,‡ and others cited in the argument. In *Hodgson* v. *Temple*, where a buyer of spirituous liquors was known to be carrying on a rectifying distillery and a retail liquor shop at the same time, contrary to law, the vendor of the spirits was held entitled to recover the price. Sir James Mansfield said: "The merely selling goods, knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment; but to effect that, it is necessary that the vendor should be a sharer in the illegal transaction."

---

* 20 Wendell, 390.        † 11 Wheaton, 258.        ‡ 5 Taunton, 181.

This seems to have been the view taken by the judge who tried this cause below, and which he applied to this case. In our judgment it is altogether too narrow a view of the responsibility of a vendor in such a case as the present. Where to draw the precise line between the cases in which the vendor's knowledge of the purchaser's intent to make an unlawful use of the goods, will vitiate the contract, and those in which it will not, may be difficult. Perhaps it cannot be done by exact definitions. The whole doctrine of avoiding contracts for illegality and immorality is founded on public policy. It is certainly contrary to public policy to give the aid of the courts to a vendor who knew that his goods were purchased, or to a lender who knew that his money was borrowed, for the purpose of being employed in the commission of a criminal act, injurious to society or to any of its members. This is all that we mean to decide in this case

JUDGMENT REVERSED, AND A NEW TRIAL ORDERED.

[See the next case.]