Mr. Justice Milleb
delivered the opinion of the court:
This is an appeal from the judgment of the Court of Claims against the appellant, rejecting his claim to the proceeds of the *10 sale of cotton under the act in regard to captured and abandoned property. That court made the following finding of facts and conclusions of law:
I. At different times during the years 1864 and 1866 large quantities of cotton were purchased by the agents of the Confederate States for the treasonable purpose of maintaining the war of the rebellion against the Government of the United States. Of cotton thus purchased by various agents in Claiborne County, Mississippi, three hundred bales were sold to the claimant by one agent, in March, 1866, for 10 cents a pound, in the currency of the United States. The sale was made by the agent as of cotton belonging to the Confederate States, and it was understoodby the claimant at the time of the purchase to be the property of the rebel government, and was purchased as such. The agent had been specially instructed by the confederate government “ to sell any and all cotton he could for the purpose of raising money to purchase munitions of war and supplies for the confederate army;” but the purpose of the sale was not disclosed to the claimant, whose purpose was not to aid the Confederate States, buying the cotton át its market value and regarding it as a mere business transaction of “ cotton for cash.” The cotton was delivered to him at the time when the money was paid, he then being a resident of Claiborne County, within .the confederate lines.
II. The cotton was captured in May, 1865, and the proceeds or some portion thereof are in the Treasury.
And the Court of Claims, upon the foregoing facts, decides as conclusions of law—
1. The government of the Confederate States was an unlawful assemblage, without corporate power to take, hold, or convey a valid title to property, real or personal.
2. The claimant was chargeable with notice of the treasonable intent of the sale by the Confederate government, and the transaction was forbidden by the laws of the United States, and wholly void, so that the claimant acquired no title to the property which is the subject of suit.
We do not think it necessary to say anything in .regard to the first proposition of law laid down by that court. Whether the temporary government of the Confederate States had the capacity to take and hold title to real or personal property, and how far it is to be recognized as having been a defacto govern *11 ment, and, if so, what consequences follow in regard to its transactions as they are to be viewed in a court of the United States, it will be time enough for us to decide when such decision becomes necessary. There is no such necessity in the present case.
We rest our affirmance of the judgment of the Court of Claims upon its second proposition.
It is a fact so well known as to need no finding of the court to establish it — a fact which, like many other historical events, all courts take notice of — that cotton was the principal support of the rebellion, so far as pecuniary aid was necessary to its support. The Confederate government eárly adopted the policy of collecting large quantities of cotton under its control, either by exchanging its bonds for the cotton, or, when that failed, by forced contributions. So long as the imperfect blockade of the southern ports and the unguarded condition of the Mexican frontier enabled them to export this cotton, they were well supplied in return with arms, ammunition, medicine, and the necessaries of life not grown within their lines, as well as with that other great sinew of war, gold. If the rebel government could freely have exchanged the cotton of which it was enabled to possess itself for the munitions of war or for gold, it seems very doubtful if it could have been suppressed. So when the rigor of the blockade prevented successful export of this cotton, their next recourse was to sell it among their own people, or to such persons claiming outwardly .to be loyal to the United States as would buy of them, for the money necessary to support the tottering fabric of rebellion which they called a government.
The cotton which is the subject of this controversy was of this class. It had been in the possession and under the control of the confederate government, with claim of title. It was captured during the last days of the existence of that government by our forces, and sold by the officers appointed for that purpose, and the money deposited in the Treasury.
The claimant now asserts a right to this money on the ground that he was the owner of the cotton when it was so captured. This claim of right or ownership he must prove in the Court of Claims. He attempts to do so by showing that he purchased it of the confederate government and paid them for it in money. In doing this he gave aid and assistance to the rebellion in the most efficient manner he possibly could. He could not have *12 aided that cause more acceptably if he had entered its service and become a blockade-runner, or under the guise of a privateer had preyed upon the unoffending commerce of his country. It is asking too much of a court of law sitting under the authority of the government then struggling for existence against a treason respectable only for the numbers and the force by which it was supported, to hold that one of its own citizens, owing and acknowledging to it allegiance, can, by the proof of such a transaction, establish a title to the property so obtained. The proposition that there is in many cases a public policy which forbids courts of justice to allow any validity to contracts because of their tendency to affect injuriously the highest public interests, and to undermine or destroy the safeguards of the social fabric, is too well settled to admit of dispute. That any person owing allegiance to an organized government can niake. a contract by which, for the sake of gain, he contributes most substantially and knowingly to the vital necessities of a treasonable conspiracy against its existence, and then in a court of that government base successfully his rights on such a transaction, is opposed to all that we have learned of the invalidity of immoral contracts. A clearer case of turpitude in the consideration of a contract can hardly be imagined unless treason be taken out of the catalogue of crimes.
The case is not relieved of its harsh features by the finding of the court that the claimant did not intend to aid the rebellion, but only to make money. It might as well be said that the man who would sell for a sum far beyond its value, to a lunatic, a weapon with which he knew the latter would kill himself only intended to make money and did not intend to aid the lunatic in his fatal purpose. This court, in Hammer v. Dome, (12 Wall., 342,) speaking of one who set up the same defense, says: “He voluntarily aids treason. He cannot be permitted to stand on the nice metaphysical distinction that, although he knows that the purchaser buys the goods for the purpose of aiding the rebellion, he does not sell them for that purpose. The consequences of his acts are too serious to admit of such a plea. He must be taken to intend the consequences of his own voluntary act.” This case, and the succeeding one of Hanauer v. Woodruff, (15 Wall., 349,) are directly in point in support of our view of the case before us.
The recognition of the existence and the validity of the acts *13 of the so-called confederate government and that of the States which yielded a temporary support to that government stand on very different grounds and are governed by very different considerations.
The latter, in most if not in all instances, merely transferred the existing State organizations to the support of a new and different national head. The same constitutions, the same laws for the protection of property and personal rights remained and were administered by the same officers. These laws, necessary in their recognition and administration to the existence of organized society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or the false federal power. They were the fundamental principles for which civil society is organized into government in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised. It is only when in the use of these powers substantial aid and comfort were given or intended to be given to the rebellion, when the functions necessarily reposed in the State for the maintenance of civil society were perverted to the manifest and intentional aid of treason against the Government of the Union, that their acts are void. (Texas v. White, 7 Wall., 700.)
The government of the Confederate States can receive no aid from this course of reasoning. It had no existence except as a conspiracy to overthrow lawful authority. Its foundation was treason against the existing Federal Government. Its single purpose, so long as it lasted, was to make that treason successful. So far from being necessary to the organization of civil government or to its maintenance and support, it was inimical to social order, destructive of the best interests of society, and its primary object was to overthrow the Government on which these so largely depended. Its existence and temporary power were an enormous evil, which the whole force of the Government and the people of the United States was engaged for years in destroying.
When it was overthrown it perished totally. It left no laws, no statutes, no decrees, no authority which can give support to any contract or any' act done in its service, or in aid of its purpose, or which contributed to protract its existence. So far as the actual exercise of its physical power was brought to bear *14 upon individuals, that may, under some circumstances-, constitute a justification or excuse for acts otherwise indefensible, but no validity can be given in the courts of this country to acts voluntarily performed in direct aid and support of its unlawful purpose. What of good or evil has flown from it remains for the consideration and discussion of the philosophical statesman and historian.
The judgment of the Court of Claims is affirmed.