HIRAM WALKER & SONS v. GRUBMAN et al.

(District Court, S. D. New York. March 31, 1915.)

1. TRADE-MARKS AND TRADE-NAMES ⬤⟿70—UNFAIR COMPETITION—IMITATION OF CANADIAN WHISKY.

Complainant and two or three other Canadian manufacturers make and sell in the United States whiskies which are different in color, composition, body, and flavor from any made in the United States, and which are known by the generic name of "Canadian" whiskies. Complainant is the largest seller of such whisky under its registered trade-name "Canadian Club." Defendants make and sell in the United States whiskies which are an imitation in color and flavor as near as may be of the Canadian. *Held*, that while defendants have the right to make and sell such whisky, it should be so distinguished that purchasers will not be deceived and buy it as the genuine Canadian; that a label thereon "Canadian Type Whisky" printed all in type of the same size and color and preceded by the maker's

name, is within his rights, but that another using the same name, but with the words "Canadian" and "Whisky" printed in red letters on a white ground with the word "Type" in black letters within a black circle, or any other form of label which gives undue prominence to the word "Canadian," is not within the maker's rights and their use constitutes unfair competition as against complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ☞70.]

2. TRADE-MARKS AND TRADE-NAMES ☞70—UNFAIR COMPETITION—DISTINGUISHING IMITATION GOODS.

When one is frankly putting out an imitation he should be held very strictly to the requirement of distinguishing his goods from the original, and any doubt must be resolved against him.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ☞70.]

3. TRADE-MARKS AND TRADE-NAMES ☞93—UNFAIR COMPETITION—INJUNCTION.

A complainant who wishes to enjoin another from selling under its true name a commodity which he has the right to make and sell, on the ground that it is an imitation of complainant's product, must go further than merely to show that at present defendant's product is not known. He must show that defendant will not, in fact, make known as he proposes the fact that it is an imitation, and that the result will be to pass off the substitute as the original.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. ☞93.]

4. TRADE-MARKS AND TRADE-NAMES ☞72—UNFAIR COMPETITION.

Under evidence showing that much the greater part of imitation Canadian whisky made in the United States, or "Canadian Type" whisky, when bought by retailers in the wood, is used for refilling bottles which originally contained genuine Canadian whisky and are so labeled, wholesalers of such whisky in the wood are chargeable with contributory fraud and with unfair competition with the makers of genuine Canadian whisky, unless before making the sales they have reasonable assurance that the buyer will not use the whisky in substitution for the genuine.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 83; Dec. Dig. ☞72.]

In Equity. Suits by Hiram Walker & Sons against Jacob H. Grubman, doing business as the West Shore Wine & Liquor Company, Maurice Lewis, and Albert Berge; against Samuel Luria and Charles A. Schreiber; against Henry Eising, Edwin Eising, and Emil Steinbarter, doing business as the E. Eising Company, Charles Spanton, and Alice Schoenholz; against Adolph Prince & Co., a New York corporation, Adolph Prince, Felix Prince, and Leonard Prince; against Louis M. Goldberg and Alexander Schwettenberg; against the Cook & Bernheimer Company, a New York corporation, Meyer A. Bernheimer, Morris Cohen, Louis R. Buchbee, George Corrigan, John Hahlers, and Charles Soyge; against Picker Bros., a New York corporation, Frederick Picker, Isadore Picker, David Gottheimer, and Charles Klein; against James D. Smith and Sydney Darling, copartners doing business as Smith & Darling; against the Bowling Green Distilling Company, Christian Plumb, John Hank, Edward Smith, James Lynch, and Michael Purcell; against Edwin Hahn, Louis Hessel, David Hunter, and William Funke; against Philip Goldberg, Louis Goldberg, and Samuel Goldberg; against David Kahn, Louis Pol-

lak, and Joseph Beck; against James M. Bell & Co., a New York corporation, James M. Bell, Gustave Spreckle, Jean Spreckle, George McFarland, and Edward Flanagan; and against Morris Ritterman, David Kraemer, and John Ring. On final hearing. Decrees for complainant.

See, also, 222 Fed. 478.

These are 14 cases brought by the same plaintiff against different defendants for unfair competition in the sale of whisky. The plaintiff alleges that it is the maker of a well-known brand of Canadian whisky which has been sold in the United States for more than 25 years under the title "Canadian Club," a name registered in the Patent Office since 1891, and that the defendants, who are all wholesale liquor dealers in the city of New York, were engaged in putting out a whisky made in imitation of the plaintiff's under the name "Canadian Type" whisky, which was an infringement of the plaintiff's rights, and were also selling such whisky in bulk in the wood to saloon keepers for the purpose of refilling the plaintiff's bottles in substitution for the plaintiff's whisky. The bills contain the usual prayer for an injunction and accounting. The defendants deny the allegations of wrongdoing, and allege that there is a type of whisky known as "Canadian" which they have the right to imitate, and which they do imitate and sell under the name "Canadian Type" whisky.

The cases were heard all together, though not formally consolidated, and upon the hearing the following facts developed:

In the United States three or four brands of whisky made in Canada have been sold for many years. By far the largest sale of these whiskies is the plaintiff's with its "Canadian Club," the next best known being Seagram's and Gooderham & Worsts'. Some sale was also shown of a Canadian whisky known as Wiser's of the same general character. These whiskies are all light in color, and made out of corn and rye in a many-chambered still, which eliminates a larger part of the essential oils that give flavor, rendering them milder to the palate, or as the phrase is, "light-bodied." No American whiskies are like these three brands in color, though some of the Bourbons approach them; none have a flavor like them, though many are not far off. There are also white Canadian whiskies of an entirely different character, which need not be considered. For many years prior to the enactment of the Pure Food Act in 1906, American whiskies were sold under the name "Canadian," with various suffixes, e. g., Canadian Malt, Canadian Wheat, Canadian White, some of which imitated the three brands in question either in color or "body." In 1906 it became illegal to sell American whisky under the name "Canadian," and all these whiskies had to conform to that requirement. Those American imitations of the three Canadian brands here in question thereupon changed their name and have for some 8 years or more gone under the name "Canadian Type" or "Canadian Style." These are and were from the outset frank imitations of the whisky sold by the plaintiff, Seagram and Gooderham & Worsts, and their sale, which has reached very substantial quantity, is justified upon the right of the distillers to make and sell any whisky, provided they honestly disclose what it is. The largest distillers of this imitation Canadian whisky are Corning & Co., of Peoria, Ill., the National Distillers Company of New York, and Clark Bros. Corning & Co., the largest distiller, sells it in the wood to wholesalers, and furnishes them labels containing the words "Corning's Canadian Type Whisky." The wholesalers, or owners of what are called "Family Liquor Stores," sell this to customers in substantial quantities in glass, either in quart or pint bottles, and quite as large, if not larger, quantities, to saloon keepers in the city of New York. There was a good deal of testimony regarding the demand for this whisky over the bar by the drink, the plaintiff asserting that there was no demand for it by the name "Canadian Type Whisky," and the defendants asserting the contrary. An analysis of that testimony will be taken up in the opinion.

In May, July, and August of 1913 the plaintiff employed detectives to go to the defendants' places of business and there to represent themselves as

saloon keepers to make purchases of Canadian Type whisky, and to see how far the defendants would advise them to use this whisky to refill Canadian Club bottles. Nine of the cases were stipulated to abide the event in the case against Philip Goldberg, and in this case the plaintiff claims to have made four visits, the first two in May and the last two in July and August. Purchases were made in May and in July of the Canadian Type whisky in five-gallon kegs, which is the smallest amount the defendant was permitted to sell. One question, sharply litigated, was as to the talk at the time of purchase, the plaintiff's witnesses asserting that the defendants had urged them to use this whisky in refilling Canadian Club bottles and had told them how it could be done, the defendants saying that although the plaintiff's witnesses had said that they meant to use the whisky to refill, they had discouraged any such practice. Six men in all visited Goldberg's store, four detectives of the Thiel Agency and two corroborating witnesses. They made reports in all cases either on the same or the next day on which the interviews took place, and these reports were sent to the agency headquarters, where they remained until shortly before the trial. In the case of the two corroborating witnesses, who were not professional detectives, the reports were not signed by them, but were written out by the daughter of one of them, a woman 30 years old, at their dictation, and at their request she signed their names. The reports with the testimony of the witnesses and the receipted bills for the purchase of the whisky constitute all the plaintiff's proofs. The defendants answer by their own oaths, admitting the purchases, but denying the incriminating advice put into their mouths.

In the other four cases which were tried, two of the detectives who appeared against Goldberg took no part. The proof consisted of the testimony of the two others and of the two corroborating witnesses. It was of the same general character, purchases of Canadian Type whisky, corroborated by documents and oral testimony that the defendants had advised them to refill bottles. The defendants in each case deny giving the advice to refill, but in most cases admit that the buyers, who represented themselves as saloon keepers, said that they purposed refilling. The testimony, so far as particular, is considered separately in the opinion.

George Gordon Battle, of New York City, and Alfred Lucking, of Detroit, Mich., for plaintiff.

Joseph M. Proskauer, Arthur L. Strasser, and Norman P. S. Schloss, all of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1] The defendants had the right to imitate the plaintiff's whisky as closely as they could, in color, in flavor, in composition. What they made they might sell; the only limitation being upon the name and dress under which they sold it. Had they called it "Imitation Canadian Club," there could have been no quarrel; the first question is whether they might call it "Canadian Type," assuming that the final consumer is adequately advised that the whisky is in fact Canadian Type. That question breaks into two: First, whether there is a Canadian Type; second, and if there is not, whether consumers might be misled into drinking whisky, called Canadian Type, supposing it was Canadian Club. I think that there may fairly be said to be a Canadian type of whisky in this sense, that these three brands are all substantially alike in color, mode of manufacture, and resulting taste to the palate, and that no other whiskies made in America are so much like them as they are like one another. I base this chiefly upon the color, but color is a most important quality in a beverage; I base it also upon the testimony relating to the mildness and lack of "body,"

which was not contradicted by the plaintiff. While, therefore, there are other whiskies made in Canada which have not this color or flavor, but which are like other whiskies made elsewhere, it seems to me that it may fairly be said that the words "Canadian Type" convey the meaning that the whisky is of the kind represented by these three Canadian whiskies. It follows that as any one may make them, he may sell them under that name if the consumer knows that he is getting the type and not the Canadian whisky itself.

[2] So far as concerns the sale by wholesalers and retail liquor shops in the bottle, I think that a label like Corning's present one is permissible. The word "Type" is of the same size as the other words; it is not disguised; it is in the same script. I cannot see that a wholesaler should be required to do more than advise the consumer of the contents of his bottle in that form. I do not think that the label of the Bowling Green Distilling Company is a proper one; the word "Type" is large enough, but it seems to my eye too much like a pattern to be effective at a distance. Whether designed or not to conceal the word, the contrast between the red letters "Canadian Whisky" upon the white background and the black letters "Type" within the black circle are in fact likely to result in the sale of the whisky as genuine Canadian whisky, which it is not. No conceivable reason appears why the word "Type" should have been so differentiated, unless it was to suppress it. Similarly, the Canadian Pacific label appears to me improper. The meaning of that title is not clear; it suggests either that it is the same whisky as sold to the Canadian Pacific Railroad or manufactured for it. This inference is much fortified by the shields bearing the words "Canadian Pacific" and surmounted by the beaver, the well-known heraldic animal of Canada. There can be no doubt that the label suggests Canadian manufacture. Goldberg's other label, Exhibit No. 11, seems to me objectionable because of the small size of the word "Type." When one is frankly putting out an imitation one should be held very strictly to the requirement of distinguishing one's goods from the original. Any doubt must be resolved against the imitator; he assumes the duty of making clear that his imitation is in fact not the real article.

I think that the plaintiff may complain of the sale of any whisky of this kind labeled "Canadian." It is true that it calls its whisky "Canadian Club," but it is the largest seller of this kind of Canadian whisky, and when a consumer asks for Canadian whisky, he means either plaintiff's or one or two other distillers'. To give him an American whisky is to divert him from the plaintiff's trade, not certainly, but probably. Where the field is so limited and the plaintiff occupies so large a part of it, a diversion of the demand from Canadian whisky is enough of a risk to the plaintiff's trade to justify an injunction. Goldberg's Canadian Pacific label is not so clear; while it probably means a Canadian whisky, it certainly means a kind of Canadian whisky which is not the plaintiff's, at least to any one who reads. While I dare say that any demand for it may arise from the popularity of the plaintiff's whiskies, I find it difficult to suppose that any one could buy it under that name with the idea that he was getting the plaintiff's

whisky. In this respect the addition of the word "Pacific" serves to create a species of Canadian, which, though itself spurious, is distinguished from the genuine species of the plaintiff. The plaintiff may therefore take a decree against both the labels first mentioned but not the last.

[3] In connection with the labels the question arises of an existing demand for Canadian Type whisky in bottles; the plaintiff contending that all such whisky, no matter what the label, really passes off as Canadian Club or some other Canadian whisky. No doubt there could arise cases where no amount of labeling would serve to advise the trade; the conditions of consumption might be such that any goods made in imitation would be reasonably certain to pass for the original. However, such conditions must be abundantly proved. In the case at bar they have not been. There is undoubtedly some honest demand for the whisky in retail liquor stores, and the plaintiff's efforts to show that there was none were not successful. Yet it would have made no difference, in my judgment, if there had been none in fact. A man who wishes to stop another from selling under its true name a commodity he has the right to make and sell must go further than merely to show that at present it is not known. He must show that the proposed seller will not in fact make known that it is an imitation in the way he proposes; that the result will be to pass off the substitute. Even if there were no existing demand for Canadian Type in bottle, I see no reason to say that when sold with an honest label, it will necessarily pass as Canadian Club. I will not say that dishonest dealers may not use such labels to the plaintiff's injury, but none of the defendants have been shown to do so with the bottled whisky. If the consumer buys of the liquor store bottles with such labels as Corning's, the chance of his buying it for Canadian Club seems to me one inherent in the right to sell the American whisky at all. Of course, I might insist upon some grotesque exaggeration of the fact that the American article was an imitation, but courts have not done this, and if it should be necessary, it can only be after some proof. Therefore I hold that the defendants may sell Canadian Type whisky in the bottle to the consumer with Corning's label or its equivalent.

[4] The next question is of the sale of Canadian Type whisky to saloon keepers in the wood. I am satisfied that the demand for this whisky over the bar is of the most trivial character. The defendants brought forward 11 (not 12, for Rand had no bar) witnesses to prove this demand against some 14 of the plaintiff. Of these 11 Nibur and Herts had a trade wholly among blacks, and it is very hard for me to believe that they ever ask for Canadian Type whisky. The phrase is awkward, and would come very hard to most men who are not trained to it; I should be disposed to accept their testimony as covering a small minimum of cases. Maronna and Lambienti knew only Canadian Pacific, which I have already found to be a misleading name, though not injurious to the plaintiff. Blois had heard of Canadian Type in the past, but now knew only Canadian Pacific. Raichle's testimony was somewhat confused; he had known of Canadian Type for 16 or 17 years, which was certainly untrue. Now he was selling a whisky

under the name Elmont, though how he sold it is not clear. It must be accepted that he sold to some who asked for Canadian Type. Bartels sold his Canadian Type whisky as Canadian whisky or "his own Canadian," which was certainly a deception and prejudicial to the plaintiff. Pottberg had a bar where people helped themselves, but he also sold Canadian Type when they asked for a drink of Canadian whisky, which is a fraud. Sternberg seems to have sold honestly. Tischler knew only a slight demand. Newgold was either an entirely reckless or a dishonest witness. Probably he had a small demand.

The upshot of all this is that there probably has arisen a very small and in my judgment an almost negligible bar demand for Canadian Type whisky. Along with it has grown up a fraudulent substitution of which we get some evidence in cases like the Canadian Pacific and Bartels and Pottberg. I am satisfied that bar drinkers will never in any quantity ask for Canadian Type whisky; there will be here and there some particular person who can be educated to it, but for the great mass of consumers the whisky will pass off as Canadian whisky. The plaintiff's testimony seems to me to show that there is nothing of the sort generally known.

Having found the fact as stated, the first question is whether the whole bar supply becomes illegal. I think not. The whisky is capable of an honest use, and the mere purchase of it by a saloon keeper is not certain evidence that he means to use it dishonestly, though I am convinced that he generally does so use it. The mere possibility of fraudulent use is of course not enough to prevent all sales (Rogers v. Wm. Rogers Manufacturing Co., 70 Fed. 1019, 17 C. C. A. 573 [C. C. A. 2d Cir.]), yet if the inevitable use of the article sold be a tort, or if the buyer announce his purpose of so using it when he buys, then the law, in my judgment, regards the seller as a contributor to the tort. The nearest analogy in the law is the doctrine of contributory infringement of patents. It has long been settled that the selling of part of a patented invention which can be used only in violation of the patentee's rights is an infringement. Wallace v. Holmes, 9 Blatch. 65, Fed. Cas. No. 17,100; Heaton Button-Fastener Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Rupp & Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544; Leeds & Catlin v. Victor Talking Mach. Co., 154 Fed. 58, 83 C. C. A. 170, 23 L. R. A. (N. S.) 1027; Id., 213 U. S. 325, 29 Sup. Ct. 495, 53 L. Ed. 805. When the article may be used honestly or in violation of the plaintiff's rights another question arises. Should knowledge of how the buyer means to use the goods be enough? That was directly decided in the affirmative in Henry v. A. B. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880. There while Mr. Justice Lurton agreed that there must be some intent and purpose that the article shall be illegally used, he thought it enough when the only fact certified was that the seller sold with the expectation that the buyer would use it to infringe. Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, however it may affect Henry v. Dick Co., supra, does not touch this part of it. This case has been recognized by the Circuit Court of Appeals of this circuit

as deciding that knowledge was enough. Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co. (C. C.) 172 Fed. 225; Id., 200 Fed. 592, 119 C. C. A. 20. Judge Ward so interpreted it, when sitting alone in Rajah Auto Supply Co. v. Rex Ignition Supply Co. (D. C.) 209 Fed. 622. Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co., supra, was particularly analogous to the case at bar, because the possible honest use was of a very limited character. In Kalem Co. v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, the films apparently had a possible innocent use, but the defendant had invited a guilty use, so that the case is hardly an authority.

On the other side is unquestionably a decision óf Judge Wheeler in Hostetter v. Van Vorst (C. C.) 62 Fed. 600. Apparently the defendant had assented to the suggestion, though he himself had not suggested, that the imitation might be sold, as an original. The case is certainly in point here, but it was decided before Henry v. Dick Co., supra, and besides especially in this field the law has grown much since that time. Another case is the decision of Judge Wallace in Hostetter v. Fries (C. C.) 17 Fed. 620, over 30 years ago. The facts are somewhat hard to ascertain from the report, and certainly a part of the opinion is not now the law·when applied to this subject-matter:

"Even if it could be assumed that they [the defendants] contemplated the further wrongdoing of the retailers, the law does not visit motives or intent unaccompanied by a wrongful overt act."

It does not appear that the jobbers to whom the defendants sold themselves in turn sold only to fraudulent retailers. If the defendants are to be understood, as in parts of the opinion seems to be suggested, as having actually shown the jobbers how to disguise the bitters for the plaintiff's, it goes beyond what I should suppose ever was permissible. ' Kalem Co. v. Harper Bros., supra.

Another analogy is in the law of contracts where there is and always has been great confusion. An illustration of the refinements which may arise is to be found in two decisions of the Massachusetts Supreme Court in the same case, Graves v. Johnson, 156 Mass. 211, 30 N. E. 818, 15 L. R. A. 834, 32 Am. St. Rep. 446; Id., 179 Mass. 53, 60 N. E. 383, 88 Am. St. Rep. 355. The seller finally recovered because he only divined that the buyer was to sell the liquor illegally without being told, and also because he was indifferent to it and did not desire it. Tracy v. Talmage, 14 N. Y. 162, 67 Am. Dec. 132, lays down the rule, probably more generally accepted in the United States than any other, that mere knowledge of the buyer's illegal purpose will not defeat action for the price. Comstock, J., on reargument (page 215) suggests that the rule would be different if the purpose was immoral as well as illegal; and it is generally said that if the purpose be a heinous crime, the seller may not sue. Hanauer v. Doane, 12 Wall. 342, 20 L. Ed. 439, was, it is true, a case of treason and on the facts not applicable, but Mr. Justice Bradley made the same distinction as Judge Comstock in Tracy v. Talmage, supra, saying that recovery could be had only when the case involved malum prohibitum, or "inferior criminality." Ernst v. Crosby, 140 N. Y. 364, 35 N. E. 603, was a case where the purpose

was to run a brothel, an inferior crime, but not merely malum prohibitum. The later English cases have perhaps gone to greater lengths than our own. Langton v. Hughes, 1 M. & S. 593, Lightfoot v. Tenant, 1 B. & P. 551. While the refilling of bottles is only an inferior crime, it is against common honesty in a very different sense from selling liquor in violation of prohibition laws, which has been the occasion of many cases like Graves v. Johnson, supra, in our books. The sale of an imitation liquor which the buyer has announced that he means to use to defraud another might therefore raise no obligation to pay the price.

However, I do not think that it is necessary to consider nicely just. what is the law on contracts, because it is quite plain that different considerations control those cases and this. When the seller of an innocent article knows that the buyer means to use it in wrong of a third person, but nevertheless delivers the goods, his delivery is an act the natural consequence of which to his own knowledge will produce injury. It is true that the injury can arise only through the mediation of the buyer's own will, but that would not ordinarily affect legal responsibility. The sale is the seller's voluntary act, and he is responsible for its known results, unless he can show an excuse. The only excuse here is his right to sell, which is of course conditioned upon the general social results of its particular exercise. While it would be an unfair condition to impose upon that right to say that the seller must inquire into, or follow up mere intimations of the buyer's purposes, there is, in my judgment, nothing unfair in imposing some duty of inquiry upon him when it is reasonably certain that the buyer will commit a tort. On the other hand, to declare a contract void between buyer and seller when the buyer announces his purpose to use the thing illegally certainly does not raise the question of the seller's responsibility to the injured person. · In such cases the law forfeits the seller's right to the price because of his misconduct, which may well require a greater degree of participation than would fasten him with civil responsibility to the injured party. Such forfeiture is not in aid of any reparation; it arises from the law's refusal to give any relief to a wrongdoer. It does not follow that every wrongdoing which creates a civil liability will be grave enough to provoke such a forfeiture. I cannot therefore accept the same test as might control if the suit were by the sellers for the price of the liquor, whatever that test may be.

I therefore conclude that to sell Canadian Type whisky to one who announces that he means to use it for refilling Canadian Club bottles is a tort. Of this tort P. H. Goldberg was guilty upon his own admissions. His statement that he told them he did not recommend or advise such a practice did not fulfill the measure of his duty. I think he was obliged reasonably to assure himself that they proposed to sell the whisky honestly before he was free to sell. The exact terms of such an assurance it is impossible to fix in advance; the buyer's merely formal, and obviously colorable, assent would not be enough, but clearly the seller's duty does not extend to a supervision over the buyer's trade. On the other hand, I think that, considering the character of the bar demand, the duty of the seller should not depend

upon the buyer's actually announcing that he means to refill bottles. The facts in this case show that the great proportion of this whisky is sold in substitution, and I can see no reason why any of the defendants should shut their eyes to facts which must be clearer to them than any one else. When they sell Canadian Type whisky to saloon keepers they know that in nine cases out of ten, probably in much greater proportion, the whisky must be used to pass off in one form or another. I cannot think that this is a mere possibility which they may disregard; I think it imposes upon them the same active duty of assuring themselves before sale that the sale in question is one of the few which will result in honest trade. Prima facie such purchases are a fraud; a seller should take some pains, when that is so, to see to it that he is not abetting such a fraud. Therefore a decree will go in all the cases for an injunction against sales of Canadian Type whisky to saloon keepers in the wood, except when the seller shall receive reasonable assurance that the buyer will use it honestly. An accounting will also be allowed for past sales upon the same basis.

This disposition of the cases makes unnecessary any decision upon the conflict of evidence between the detectives and the defendants. Against the event, however, that the Circuit Court of Appeals may take a different view from mine regarding the duty of a seller under these circumstances, and in view of the fact that I have seen the witnesses, I shall discuss the evidence upon the assumption that the defendants may be enjoined only from actively counseling the substitution of Canadian Type whisky for Canadian Club. In what cases have they actually done this? At the outset I think we should remember that, as I have said, the great proportion of bulk sales to saloon keepers must be known by the defendants to result in a fraud. When the question arises of the probability of the defendants having counseled substitution, this is, to my mind, a most important consideration. Any indignation at the suggestion that they actually counseled what all knew was most probable seems to me absurd. If in fact they did not quite freely discuss and recommend substitution, it could hardly have been from any genuine scruple, but rather from timidity, or a belief in what they supposed were their exact technical rights. I cannot therefore regard the detectives' stories as being inherently unlikely; nor does the case come at all as if the defendants did not, at least indirectly, contribute to what they must certainly know to be frauds. Furthermore, that they should deny the words put in their mouths is not too unlikely, because, while sales like these are perhaps not gravely wrong, surely they show a moral obtuseness to fair dealing which cannot be disregarded, especially when the denials are necessary to avoid a criminal exposure.

Coming to the plaintiff's evidence, it is certainly strong enough unless it was altogether fabricated. The reports are said to have been written out either upon the day of the talk or the day after; the detectives were out to get evidence of substitution, and it is hardly within the bounds of reason that they should have honestly but mistakenly imagined that the defendants said what they put into the reports. So far as honest forgetfulness may explain the divergence of story, the chances are all against the defendants to whom these

visits were one or two among many which occurred daily in their business, and which remained wholly unimportant for several months, until these suits were brought. As respects Gleason and Gates the reports are much fortified by the testimony of Mrs. Burchardt, who impressed me most favorably. I do not regard as very important the physical appearance of the reports themselves. They are rather surprisingly fair on their face, it is true, but not wholly so; for there are some which have four or five whole lines changed, while a word or two is corrected now and then elsewhere. We are not to suppose these reports to have been prepared with the nicety of a pleading; it is quite likely that Gleason and Gates agreed roughly and not too accurately upon what the interviews really were, and told Mrs. Burchardt to put it down, well prepared to stand behind it as literally true, though it was nothing of the kind. That is the natural psychology of many men, and its possibility here influences me little towards concluding that they were capable of a comprehensive web of perjury. Neither of these men seemed to me mentally capable of anything of the sort. A more reasonable explanation, assuming that Gleason and Gates should be entirely discredited, is Mr. Proskauer's, that Secord prepared the reports or told Gleason and Gates what to put in them, and that they acted at his direction. I should hardly have supposed that with men of their intelligence, such a course could have escaped · Mrs. Burchardt's knowledge, or that she could have sworn as she did, if it had been done in that way.

Of the six men themselves, Wright and Brady made the best appearance both for honesty and intelligence. Gleason was next in my judgment, a heavy, dull man, who stuck very persistently to his report, but who nevertheless seemed to me honest. Gates did not carry as much weight as Gleason, but stood much better than Secord and Payne. Upon the latter's testimony uncorroborated, I should not base a finding, if they were contradicted by honest seeming witnesses.

The combination of these six witnesses, coupled with the inherent probability of their story, leads me to find that the defendants Goldberg did counsel the substitution of Canadian Type for Canadian Club. The defendants object to several details in Wright and Brady's report. Thus they say that Goldberg could not have told them that he had shipped Canadian Type to Maurer. I cannot see why he should not have seized his last customer for an illustration, and the fact that he did ship to Maurer on the 13th lends color in my mind to the statement that Wright and Brady were there on that day. The Hannah shipment gives such a conclusion much greater certainty. Again, I can find no very good explanation for the bill which reads, "C. Whisky"; nor does the occurrence of Mrs. Carroll's name in the reports seem to me very well explained. Upon this conflict of testimony I find for the plaintiff, and the finding applies to all nine cases.

The next case is Cook & Bernheimer's. This depends upon the testimony of Secord and Payne for the first interview, and of Secord, Gleason, and Gates for the second. It is in my judgment corroborated by the exchange of letters. The defendants of course realized that these letters, taken as they read, left no room for an innocent interpretation, and they explained it upon the theory that it was a

decoy. I do not accept this explanation for several reasons. In the first place the salesman who had gone to Stamford to look up Secord and Payne was not called, though still in their employ. In the second, Buchbee's testimony was contradictory as to whether he had given Wahlers instructions to refer the detectives to him should they call again; moreover he did not greatly impress me on the stand, as also Cohn did not. Again, Wahlers' story seems to me certainly false. It is of course possible that though Buchbee had told him to refer the detectives to him, and though he knew that they were detectives, he should still have failed to connect the two, but it is in the highest degree improbable. He acknowledges that he had heard of but one set of detectives out for evidence about Canadian Club, and that he at once thought these were they. Gleason and Gates, it is true, had different names, but Secord was there, and he had written to Secord and Payne. Again I can see no reason to believe the detail of Secord's asking for a commission. We know in fact that Secord, whether honest or not, could not have expected a commission because Gleason and Gates made no purchases in any of the stores. Why should Secord have supposed that such a ruse would have added to the verisimilitude of the trap? If it had been his practice I think we should have seen it in the other reports. It was in my judgment added by Wahlers to discredit Secord, but in that aspect is absurd. Sozzi's testimony is most unsatisfactory. His suspicions excited by Wahler's conduct are, in my judgment, an afterthought. Finally, consider the case more broadly. Cohn says that nothing was said at the first interview about substitution. If he is right, is it possible that Secord would have written the letter? He must at least have hoped that he would get a favorable answer, and if the interview had been as Cohn says, is it conceivable that he should have thought such an answer possible? The answer he must have thought he would get would have completely destroyed the case; it would have asked what he was about. Or if Buchbee had meant to decoy Secord and Payne, instead of merely repudiating their suggestion, his letter was not apt for his purpose. He could easily have induced them to come in on a pretense of better matching Canadian Club, and have prepared a case which would certainly have cleared him. I have no hesitation in finding for the plaintiff in this case.

The next case is Kahn's, which depends wholly upon Secord and Payne's testimony, together with such corroboration as is to be found in two circumstances: First, the label of his Canadian Style whisky, and the name of his gin; second, his unwillingness to complete the sale. As to the first, I am satisfied that the label was intended as an imitation of Gooderham & Worsts'. No explanation is suggested, and the use of "G. W. W." in such a connection is hardly explainable upon any other theory. I cannot regard as honest the name, "Douglas & Son Brand" when applied to gin sold in bulk. Gordon gin has the greatest market, and there can, to my mind, be no reason for selecting that arbitrary name except with the hope of confusion. I do not say that one infringes the other, but I do think the motive is apparent.

Kahn's refusal to complete the sale or give back the money without the bill is more perplexing. His explanation and Pollak's is not prob-

able, i. e., that Pollak had found after the document passed that Secord and Payne proposed refilling, and that they did not wish a bill in the hands of such men. It was perhaps reasonable to refuse to fill the order, but there was no occasion for solicitude about the bill, provided Secord and Payne gave a receipt for the money, which they offered to do. If it was only the case of dishonest saloon keepers to whom they had refused to sell, and to whom they had paid back the money, why should they have anticipated trouble from possession of the bill? Such men would not trouble them; the only possibility was of black-mail, and that was not in Kahn's mind. I must conclude that before August 13th, the date of Kahn's first interview, he had learned that they were detectives and wanted to get back the bill for that reason. Moreover, Pollak must have had some reason before July 25th, or thereabouts, for refusing to fill the order, because in normal course it would have gone out within a day or two after July 23d, when it was given. I cannot think that his reason was the word dropped by Secord before he left. In the first place it would not have disturbed a man who was habitually selling Canadian Type in bulk, who put out the label on the G. W. W. bottle and who sold "Douglas & Son brand" of gin; in the second, had it shocked his scruples, I think, it would have called out some remark at the time. I believe that Pollak became suspicious thereafter, and that was because he had heard something of Secord and Payne. It is true that the time seems a little early, but we know that the warning circular went out to the trade dated August 1st, and the news may well have got to Pollak within a few days of the order. Of course Kahn's subsequent efforts to get the bill are not necessarily evidence of the truth of Secord and Payne's report. A man may wish to get back documentary evidence because he fears a case which he knows to be spurious in fact. Yet such concern is more consonant with guilt than with innocence, especially when it is afterwards supported by a denial of the true explanation. Taking this case in its entirety, I believe that the reports are corroborated, and I find for the plaintiff.

There remain the two cases of Smythe and Hahn. Upon these the testimony of Secord and Payne is not corroborated at all, except as to the defendant Funke in Hahn's case. The only circumstance which influences me to accept their story is that, having found them to have been truthful in so many of the cases, it seems hardly proper to disregard them when they chance to be unsupported. I can only say in answer that while my guess would be that they were right in both these cases, I have too much question to make a finding upon the uncorroborated testimony of Secord and Payne. The plaintiff may, however, take a decree against Funke, if it wishes, because I shall accept the report of Gleason and Gates added to that of Secord and Payne. It seems to me most unlikely that only Payne and Gleason should have called upon what was obviously a "follow-up" visit. The purpose of such visits was to obtain cumulative testimony, and the four always went together except once. Payne was away on the "follow-up" visit to Cook & Bernheimer, but that fact was mentioned in the report made of that visit, which was not the case here. Gleason and Gates always

went together, and there is no reason why they should not have done so here. Again, Funke said on direct examination that one of the two visitors on the first visit, who were concededly Secord and Payne, brought a "young man" with him as. his partner on the second visit. Later he identified Gleason as the "young man," though no one could possibly· ever describe him as such. Moreover, Secord and Payne never introduced the others as partners, but as friends about to go into a new business. Either Funke remembered nothing about the visit, or he did not mean to tell the truth. While it does not follow that he actually said what was put in his mouth, yet his denial seems to me of small probative weight, and I find against him.

The decree will be substantially as follows, subject to any modification on submission by the parties of proposed decrees:

This cause came on to be heard at the March term of this court and was argued by counsel, and thereupon, upon consideration thereof, it is

Ordered, adjudged, and decreed that the defendants, A. B. and C., be and they hereby are, each and all, enjoined from selling Canadian Type whisky in the wood to saloon keepers, unless they receive reasonable assurance from the buyers that they will not use it in substitution for the plaintiff's whisky; and it is further

Ordered, adjudged, and decreed that ———, Esq., take and state an account of the profits of all such Canadian Type whisky sold by each and all of the defendants during the past 6 years, the defendants having the burden of showing, either that such whisky was not in fact used in substitution for the plaintiff's whisky, or that they had, at the time of sale, received reasonable assurance that it would not be so used; and it is further

Ordered, adjudged, and decreed that, the said defendants having recommended said Canadian Type whisky when sold in the wood to saloon keepers for the purpose of substitution, they are, each and all, hereby enjoined from so recommending the said whisky in any manner; and it is further

Ordered, adjudged, and decreed that the defendants are hereby enjoined from using as labels on Canadian Type whisky when sold in the bottle the label annexed at the foot hereof, or any other label, substantially like the same; and it is further

Ordered, adjudged, and decreed that the plaintiff do recover its costs of the defendants to be taxed by the clerk.

The third paragraph will be omitted from the Smythe and Hahn cases, except as to Funke; the fourth paragraph will appear only in the Goldberg and Smythe cases with the proper label annexed.

The plaintiff must not use this decree or opinion for advertising purposes beyond a fair statement of its contents and moderate comment therein. If such advertisements appear as have appeared in other cases, I will entertain a motion to vacate these decrees and hold open the cases undecided.